# In the

# United States Court of Appeals

## For the Seventh Circuit

———————

No. 02-3669

JOSEPH R. ANDERER, JR.,

*Plaintiff-Appellant,*

v.

POLICE CHIEF ARTHUR JONES, *et al.*,

*Defendants-Appellees.*

———————

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 01-C-668—**J.P. Stadtmueller**, *Judge.*

———————

ARGUED FEBRUARY 25, 2003—DECIDED OCTOBER 6, 2004

———————

Before POSNER, COFFEY, and WILLIAMS, *Circuit Judges.*

WILLIAMS, *Circuit Judge.* Joseph R. Anderer, Jr. is a former Milwaukee police officer who was arrested for physically abusing a child. Though he was not prosecuted, Anderer was terminated following an internal affairs investigation into this incident. Anderer sued the police chief, other officers involved in his arrest, and the City of Milwaukee for violating his Fourth Amendment rights by arresting him without probable cause, and for terminating his employment after his representative spoke out against the arrest and Anderer filed this lawsuit. Finding that probable cause existed at the time Anderer was arrested and that the

speech at issue was not protected by the First Amendment, the district court granted summary judgment to defendants. We agree with the district court's decision and affirm.

## I.  BACKGROUND[1]

On April 17, 2001, Milwaukee police officer Joseph Anderer and several other officers arrested four juveniles for burglarizing a boat. After the juveniles were handcuffed, and while they were being escorted to the patrol cars, one 12-year-old boy (whom we will call JR) started shouting that one of the officers who was escorting him to the car, Officer Jeffrey Cook, was touching him on the buttocks and trying to rape him. Three of the juveniles were then transported to the police station by Officer Cook and his partner Officer Jeffrey Logan, while Sergeant Michael Jones, Officer Janice Shoman, Anderer, and JR remained behind. JR was placed in a patrol car and driven to the station by Anderer, while Sgt. Jones interviewed witnesses before returning to the station.

Once Anderer and JR arrived at the station, several officers noticed that JR was bleeding from the nose and mouth and had blood on his clothing. Lieutenant Kim Stack asked JR what happened, and he said that Anderer hit him in the face. When Sgt. Jones heard Lt. Stack talking to JR, he asked JR what had happened to him, and JR said that Anderer hit him. Sgt. Jones then asked Anderer how JR had received the bloody nose, to which Anderer responded, "how would I know . . . I just transported him." Several other officers also interviewed JR, including Lt. Mary Hoerig and

---

[1]  Because "[t]he existence of probable cause turns on the information known to the officers at the moment the arrest is made, not on subsequently-received information," *Spiegel v. Cortese*, 196 F.3d 717, 723 (7th Cir. 2000), we limit our recitation of facts to those known at the time of the arrest.

Detective William Smith of the Internal Affairs Department (IAD), and he told them all that he had been hit in the face by Anderer.

When Det. Smith interviewed him, JR explained the details of the burglary for which he had been arrested. JR said that when he was placed in Anderer's patrol car, Anderer did not immediately shut the door, but instead asked him questions about what JR had been saying Officer Cook did to him. JR then said that when he told Anderer that Officer Cook nudged him in the buttocks with a flashlight, Anderer started yelling at him and told him he shouldn't be making up "bullshit lies." JR told Det. Smith that he got smart with Anderer, ignored him, and looked away. JR stated that when he turned back to face Anderer, Anderer struck him in the face and caused his nose and mouth to bleed.[2] JR added that while he was being transported to the station, Anderer was yelling at him and saying "do you understand me?", and at one point stopped the car, opened the back door, and said he was going to "whip [JR's] ass." JR said he thought they were alone when all of this occurred and did not know if anyone else had witnessed it.

While others were talking to JR, Officer Cook contacted JR's mother to inform her that JR had been arrested. JR's mother admitted that she was not surprised that JR had been arrested for burglary and advised Officer Cook that JR was taking several prescription medications, including two that Officer Cook recognized as pills to "help control a person's mental state." She also told him that JR had not taken his medication that day and needed to be released from custody as soon as possible. Officer Cook informed Sgt. Brunson and IAD Detectives Harrison and Smith that he had been in contact with JR's mother and that JR had been prescribed a variety of drugs that he had not taken all day

---

[2] Photographs were later taken that showed cuts on the inside of both of JR's lips, and blood on his shirt and pants.

and should be processed as soon as possible.

Det. Smith attempted to interview Officers Cook and Logan about the facts surrounding JR's arrest and the cause of his injuries, but they refused to give a statement without police union representatives present. Det. Smith interviewed Sgt. Jones, who indicated that he was the last person to leave the scene of the arrest and that he had not seen any sign of injury to JR. Sgt. Jones informed Det. Smith that he saw no blood on JR at the scene, and probably would not have noticed the cuts on the inside of JR's lips, but there was enough blood on his shirt at the station that he would have noticed it if it had been there earlier. Sgt. Jones then relayed to Det. Smith the substance of his interview with JR, in which JR detailed the events that resulted in his arrest and the interactions with Anderer that resulted in JR's bloody nose and lip.

Detectives Smith and Harrison then interviewed Officer Janice Shoman, who also provided details about JR's arrest. She indicated that she left the scene to pursue another crime before JR was transported to the station, but before she left she saw Anderer with JR in the back of Anderer's car. She could not recall if JR had handcuffs on, but did not see any physical confrontation between JR and Anderer. She stated that she did not see any blood or injury on JR, and said she would have noticed if there had been blood on his shirt.

Anderer refused to give a formal statement without union representation, but at one point asked, "off the record,"[3] "What did he say I hit him with?" When he was told by one officer that JR said he had punched him in the face, Anderer stated that he was a 200 pound man and if he had punched JR in the face it would have left bruises on JR. Anderer

---

[3] While Anderer's question was meant to be "off the record," Anderer put the contents of this "off the record" conversation in both his affidavit and his briefs.

then let the investigating officers inspect his hands, but no photographs were taken, as there did not appear to be any marks or injuries on them. Anderer did not provide any explanation for how JR received the cuts and bloody nose. He did not indicate that there had been any force exercised in effecting the arrest, nor did he suggest that any kind of accident or incident had occurred on the way back to the station. Anderer states that during the course of his "off the record" conversations with them, Detective Harrison, Lt. Stack, and Officer Cook told him that they thought JR's claim was bogus, to which Anderer responded to Officer Cook that he thought was going to get "*Driebel*ed."[4]

Lt. Hoerig placed a call to Milwaukee Police Chief Arthur Jones to apprise him of the situation. Chief Jones asked Lt. Hoerig if she thought there was probable cause to arrest Anderer for physical abuse of a child, in violation of WIS. STAT. § 948.03. Lt. Hoerig informed Chief Jones that she believed there was probable cause to arrest, and the investigating detectives concurred. Chief Jones asked Lt. Hoerig if she would arrest Anderer if he were a private citizen, and Lt. Hoerig indicated that she would. Chief Jones then ordered Anderer's arrest.

Immediately following his arrest, Anderer was taken to the Milwaukee County Criminal Justice Facility, where he was held for twelve hours before being released without bail. That afternoon, April 18, Anderer appeared at the Deputy District Attorney's office to make a statement, but

---

[4] Getting "*Driebel*ed" is a slang term used by Milwaukee police officers that refers to a police officer who is arrested without probable cause. We assume the term takes its name from the facts underlying this court's decision in *Driebel v. City of Milwaukee*, 298 F.3d 622 (7th Cir. 2002), in which we concluded that probable cause to arrest did in fact exist at the time that Officer Robert J. Driebel was arrested. *Id.* at 645. In that case, however, we did find that there was no probable cause to arrest another officer (Officer Johnny C. Sgrignuoli). *Id.* at 651.

because the union attorney was not present, his statement was to be rescheduled. On April 19, after being authorized by Anderer, union president Bradley DeBraska told a local TV station that Anderer was arrested without probable cause because of vindictiveness of the IAD Unit due to prior run-ins between Anderer and one of the IAD investigators, and the union was "hoping and praying" Anderer would sue the police department to correct these wrongs.

On June 7, the district attorney's office decided not to pursue the criminal charges against Anderer with respect to JR's accusation. At that time, a local Milwaukee television station reported that charges would not be pursued and that Anderer had retained an attorney to file a complaint against the Milwaukee Police Department and its police chief. On June 13, the reopened criminal investigation into JR's allegations was closed and no further information was developed to further a potential prosecution. On June 19, Anderer was required to give a statement to the IAD for the purpose of a work-rule-violation investigation of his excessive use of force.

On July 2, Anderer filed suit in federal district court alleging violations of his civil rights for arresting him without probable cause with respect to JR's accusation. On July 6, the IAD commander issued charges against Anderer alleging that he violated rules and regulations with respect to JR's arrest, and in doing so he quoted from the allegations in Anderer's complaint. On July 17, Chief Jones terminated Anderer's employment, which Anderer has appealed to the City's Fire and Police Commission. Anderer then filed an amended complaint, adding a count alleging that he was terminated in retaliation for exercising his First Amendment rights.

Defendants filed a motion for summary judgment, claiming that there was probable cause to arrest Anderer and that his First Amendment count failed to state a claim for

relief. The district court granted summary judgment on Anderer's Fourth and First Amendment claims, finding that there was probable cause for his arrest and the speech at issue concerned a private personal dispute that was not a "matter of public concern." Anderer appeals.[5]

## II. ANALYSIS

### A. Probable Cause to Arrest

We review a district court's grant of summary judgment de novo, and in doing so draw all reasonable inferences from the record in the light most favorable to Anderer, the non-movant. *Woods v. City of Chicago*, 234 F.3d 979, 986 (7th Cir. 2000). This court discussed at length the standard for evaluating probable-cause-to-arrest challenges in § 1983 cases in *Spiegel v. Cortese*, 196 F.3d 717, 723 (7th Cir. 1999), and *Driebel v. City of Milwaukee*, 298 F.3d 622 (7th Cir. 2002). Probable cause is " 'a commonsense determination, measured under a reasonableness standard.' " *Spiegel*, 196 F.3d at 723 (quoting *Tangwall v. Stuckey*, 135 F.3d 510, 519 (7th Cir. 1998)). Probable cause exists if, at the time of the arrest, " 'the facts and circumstances within [the arresting officer's] knowledge and of which she has reasonably trustworthy information would warrant a prudent person in believing that the suspect had committed or was

---

[5] The district court, in granting defendants' motion for a protective order, stayed all discovery pending the court's resolution of defendants' summary judgment motion. The district court also denied Anderer's request for copies and use of JR's post-arrest medical records in defendants' possession (apparently unlawfully obtained). Because JR's medical records were obtained after Anderer was arrested, they are irrelevant to the probable cause determination. *See Spiegel*, 196 F.3d at 723. Therefore, we do not find that the district court abused its discretion in denying Anderer's request for access to and use of the records.

committing an offense.'" *Id.* (quoting *Qian v. Kautz*, 168 F.3d 949, 953 (7th Cir. 1999)).

In evaluating whether probable cause was reasonably determined, the court "must consider the facts as they would have reasonably appeared to the arresting officer 'seeing what he saw, hearing what he heard' at the time of the incident." *Driebel*, 298 F.3d at 643 (quoting *Richardson v. Bonds*, 860 F.2d 1427, 1431 (7th Cir. 1988)); *Spiegel*, 196 F.3d at 723 ("The existence of probable cause turns on the information known to the officers at the moment the arrest is made, not on subsequently-received information."). "An officer's belief in the existence of probable cause '*need not be based on evidence sufficient to support a conviction, nor even a showing that the officer's belief is more likely true than false.*'" *Driebel*, 298 F.3d at 643 (quoting *Woods*, 234 F.3d at 996) (emphasis in original). Accordingly, "'as long as a reasonably credible witness or victim informs the police that someone has committed, or is committing, a crime, the officers have probable cause to place the alleged culprit under arrest, and their actions will be cloaked with qualified immunity if the arrestee is later found innocent.'" *Spiegel*, 196 F.3d at 723 (quoting *Jenkins v. Keating*, 147 F.3d 577, 585 (7th Cir. 1998)). In reviewing a probable cause determination, the court should consider whether the arresting officer "'acted reasonably under settled law in the circumstances, not whether another reasonable, or more reasonable, interpretation of the events can be constructed several years after the fact.'" *Id.* (quoting *Humphrey v. Staszak*, 148 F.3d 719, 725 (7th Cir. 1998)). "Moreover, this court has emphasized that once probable cause has been established, officials have 'no constitutional obligation to conduct any further investigation in the hopes of uncovering potentially exculpatory evidence.'" *Id.* (quoting *Eversole v. Steele*, 59 F.3d 710, 718 (7th Cir. 1995)).

With these standards in mind, we agree with the district

court's conclusion that probable cause to arrest existed at the time Anderer was arrested.[6] In Wisconsin, a person physically abuses a child when he intentionally or recklessly "causes bodily harm to a child." WIS. STAT. § 948.03. Here, JR arrived at the police station in Anderer's sole custody and was bleeding from his nose and mouth with split lower and upper lips, and no police officer observed him in that condition at the time of his arrest or when he was turned over to Anderer's sole custody. JR told several police officers the same story: Anderer had hit him in the face when JR had gotten "smart" with Anderer.[7] Anderer

---

[6] The dissent's analysis stresses that the summary judgment standard requires us to view all facts in the light most favorable to Anderer. While we certainly view all facts in the light most favorable to Anderer and draw all reasonable inferences in his favor, *Woods*, 234 F.3d at 986, our review of a probable cause determination does not ask whether an officer's belief in the existence of probable cause is more likely true than not true. *Driebel*, 298 F.3d at 643. Rather, our review focuses on whether a reasonable officer would have believed that probable cause existed to arrest Anderer based on the facts and circumstances known to the officer at the time of the arrest. *See id.*; *see also Beauchamp v. City of Noblesville*, 320 F.3d 733, 743 (7th Cir. 2003) ("Probable cause is only a probability or substantial chance of criminal activity, not a certainty that a crime was committed") (citing *Illinois v. Gates*, 462 U.S. 213, 244 n. 13 (1983)).

[7] Anderer claims that JR's story is inconsistent because while all the officers reported that JR said Anderer "hit" him in the face (statements or reports of Officers Cook and Logan, Lt. Stack, and Sgt. Jones), Anderer says one officer told him that JR had said Anderer "punched" him in the face (Det. Harrison's statement to Anderer in "off the record" conversation), and one report indicates JR said Anderer "back-handed" him in the nose and mouth (Det. Smith's report of JR's statement to Deputy District Attorney the day *after* Anderer was arrested). We think this is a difference without a distinction, as they are all forms of "hits." Furthermore, because

(continued...)

offered no explanation to the investigating officers for how JR's injuries might otherwise have occurred, and appears only to have inquired about what JR claimed Anderer had hit him with. Given these circumstances—a 12-year-old's injuries and bloody appearance, his consistency in reporting how he had been injured, and Anderer's total failure to provide any explanation for the injuries when no other officer observed JR in that condition prior to turning him over to Anderer's sole custody[8]—we believe the Milwaukee police officers had probable cause to believe that Anderer had intentionally or recklessly caused JR's bodily injury. *See* WIS. STAT. § 948.03.

Anderer claims that JR was not a credible victim because (1) he had made other allegations about Officer Cook earlier that evening, and (2) the officers investigating JR's claims knew JR was on medication for mental illness and had failed to take his pills that day. We disagree with Anderer's conclusion with respect to both assertions. JR himself

---

[7] (...continued)
the "back-handed" description was not known at the time of Anderer's arrest, it is irrelevant to our analysis. *See Spiegel*, 196 F.3d at 723.

[8] Although the dissent contends that any reference to Anderer's failure to explain JR's bloody appearance in the probable cause analysis impinges on Anderer's Fifth Amendment and contractual rights, Anderer himself makes no such argument and, in fact, concedes his inability to explain JR's injuries. *See* Pl.'s Resp. to Def.'s Motion for Summ. J. at 73 ("[D]efendants state they are entitled to summary judgment because it is undisputed that Anderer did not explain how J.R. was injured, or claim that he used lawful force to maintain custody of J.R. In this respect, plaintiff does not dispute these facts."). Recall, too, that before Anderer said he did not wish to make a formal statement without union representation—the focus of the dissent's argument on this point— Anderer made several voluntary comments to other officers, including that he did not know how JR received the bloody nose. (Compl. ¶ 34; Anderer Aff. ¶¶ 60, 75, 79-81.)

reported to the investigators that he had made allegations about Officer Cook and he explained that it was his repetition of those statements to Anderer that he believed prompted Anderer's hostility and violence. As for JR's failure to take his medication, the fact that the investigating officers knew about JR's medication does not *ipso facto* negate JR's credibility or require the officers to further investigate JR's medical history to substantiate or refute his claim of abuse by Anderer, *see Driebel*, 298 F.3d at 643; *Spiegel*, 196 F.3d at 723. And the fact that investigators later learned that JR had previously been diagnosed with psychosis, paranoia, hallucinations, and self-mutilation is irrelevant to what the officers reasonably knew at the time they arrested Anderer. *Spiegel*, 196 F.3d at 723.[9]

---

[9] As we have noted, "[t]he existence of probable cause turns on the information known to the officers at the moment the arrest is made, not on subsequently-received information." *Spiegel*, 196 F.3d at 723. In addition to later-acquired knowledge about JR's medical history, we are puzzled by the dissent's discussion of irrelevant facts which have no bearing on what the officers reasonably knew when they arrested Anderer, such as: (1) the Deputy District Attorney's later decision not to pursue criminal charges; (2) subsequent investigations into Anderer's arrest; (3) statements in affidavits signed after Anderer's arrest containing information other than that made known to officers before Anderer's arrest; (4) photographs of JR, as they were developed after Anderer's arrest; and (5) statements made by identification technicians after the arrest. While the dissent's discussion of these facts and the adequacy of the department's investigation might present a persuasive closing argument in a criminal trial, the officers did not need to establish Anderer's guilt of the underlying charge beyond a reasonable doubt, or even by a preponderance of the evidence, before arresting him. *See United States v. Funches*, 327 F.3d 582, 587 (7th Cir. 2003). Moreover, although the dissent emphasizes that no officer saw Anderer hit JR, that no officer saw the action does not negate the undisputed facts that a 12-year-old boy, unin-

(continued...)

Anderer further claims that no officers corroborated JR's allegation and that no effort was made to interview the other officers and citizen witnesses who were present at the time of the arrest. First, while Sgt. Jones and Officer Shoman could not corroborate JR's allegation against Anderer, neither could they refute it, and both stated that JR was not bloody at the time he had been turned over to Anderer's sole custody. Second, Sgt. Jones and Officer Shoman were interviewed, and there were efforts made to interview other officers; Officers Cook and Logan were asked to provide a statement prior to Anderer's arrest, but they refused to do so without union representation. Notably, when Officers Cook and Logan finally agreed to give statements (very shortly after Anderer's arrest), they could neither corroborate nor refute JR's allegations. Furthermore, they could not explain JR's bloodied condition, and both stated that JR had not been bloody at the time he was turned over to Anderer's sole custody.[10]

Anderer also asserts that probable cause was lacking because two identification technicians ("ID techs") who took

---

[9] (...continued)
jured at the time he was turned over to Anderer, arrived at a police station with blood on his face and shirt after being in Anderer's sole control, identified Anderer as the cause of his injuries, and neither Anderer nor any other officer could offer any explanation for the boy's injuries.

[10] Indeed, the statement given by Officer Cook, had it been given prior to Anderer's arrest, seems likely to have further supported the investigating officers' determination that probable cause existed to arrest Anderer. (He told the investigators that when Anderer and JR arrived at the station, he "immediately noticed [JR] with blood running down both nostrils, his chin, blood on his shirt and both pant legs," and "was taken aback because the kid was in perfectly good shape before he went into the squad, but not when he came out and thought that's not good.")

photographs of JR's injuries and appearance within hours of Anderer's arrest believed that "there were no injuries on JR" or that the injuries were "very minor." Anderer appears to believe that these ID techs should have been consulted by the officers investigating JR's claims prior to arresting Anderer, but we fail to see why this would be necessary when the investigating officers themselves regularly investigate batteries against persons and are capable of assessing the nature and possible cause of injuries. And once those officers determined that probable cause had been established, they had " 'no constitutional obligation to conduct any further investigation in the hopes of uncovering potentially exculpatory evidence.' " *Spiegel*, 196 F.3d at 723 (quoting *Eversole*, 59 F.3d at 718). Furthermore, one ID tech did not photograph JR until *after* Anderer had already been arrested, and so would have had nothing to contribute to the probable cause determination prior to his arrest, and the other ID tech's photographs were not developed until *after* Anderer's arrest.[11]

Finally, Anderer points to other occurrences after his arrest as evidence to support his argument that probable

---

[11] We note that the ID techs' "observations" were not included in the initial affidavits that they provided six months after the incident, and were only included in the affidavits they provided a year after they took the photographs. We review probable cause determinations based on the information available at the time of the arrest, to assess whether the arresting officer " 'acted reasonably under settled law in the circumstances, *not whether another reasonable, or more reasonable, interpretation of the events can be constructed several years after the fact.*' " *Spiegel*, 196 F.3d at 723 (quoting *Humphrey*, 148 F.3d at 725) (emphasis added). Similarly, the dissent's conjecture that other factors could have caused JR's bloody nose and cuts to his face does not bear on our analysis. Again, we emphasize that our inquiry focuses on whether probable cause existed to arrest Anderer, not on whether other explanations for JR's injuries are also possible. *See id.*; *Driebel*, 298 F.3d at 643.

cause did not exist. Anderer challenges JR's credibility by arguing that the Deputy District Attorney's decision not to pursue criminal charges means there was no prosecutorial merit to JR's claim. The decision not to pursue criminal charges,[12] made months after the actual arrest and with information not available at the time of the arrest, *see Driebel*, 298 F.3d at 643, does not constrain or guide our analysis of whether probable cause existed at the time Anderer was arrested. *See id.* ("An officer's belief in the existence of probable cause '*need not be based on evidence sufficient to support a conviction, nor even a showing that the officer's belief is more likely true than false.*'") (quoting *Woods*, 234 F.3d at 996) (emphasis in original). It is similarly not relevant to our analysis that the booking judge commented, when ordering Anderer's release without bail, that JR's "allegations against [Anderer] were baseless and that the show up report presented no probable cause to have [Anderer] arrested in the first place."

## B.   Retaliation for First Amendment Speech

Anderer alleges that he was retaliated against and terminated, in violation of his First Amendment rights, in response to (1) statements made by union president Bradley DeBraska,

---

[12] The Deputy District Attorney, in his memo explaining his decision not to pursue charges, recounted the facts of JR's claims and wrote that, while he could not "state with assurance what happened[,] [he] believe[d] it more probable, particularly in view of [his] knowledge of prior complaints against Anderer, that Anderer did strike [JR]. It is entirely conceivable, however, that given [JR's] agitation, mental problems and stated intentions to get money out of this incident, that he inflicted the injuries to himself. Such speculation, however, is not the stuff of criminal charges, and none can be proven in this case."

with Anderer's apparent authorization,[13] that Anderer had been arrested without probable cause as a result of IAD vindictiveness due to personal animus with one of the IAD investigators, and that the union was "hoping and praying" that he would sue the police department to correct these wrongs, (2) Anderer's confirmation that he had retained a lawyer to look into the matter, and (3) his filing of this law-suit against defendants.

Whether a government employee's speech is protected by the First Amendment is a legal question that we review de novo. *Gustafson v. Jones*, 290 F.3d 895, 906 (7th Cir. 2002). As we explained in *Gustafson*, there are four elements to a First Amendment retaliation claim,[14] but the only element at issue here is whether Anderer's speech was a "matter of public concern." *Id.* at 906-07. "Whether a government em-ployee's speech addresses a matter of public concern depends upon 'the content, form, and context of [the speech] as re-vealed by the whole record.'" *Id.* at 907 (quoting *Connick v. Myers*, 461 U.S. 138, 147-48 (1983)). "Of these three factors,

---

[13] We will assume, without deciding, that speech authorized by one person but made by another could be the basis for an First Amendment claim.

[14] To prove a First Amendment retaliation claim in the employ-ment context, "[f]irst, the plaintiffs must prove that their speech was a matter of public concern. Next, they must prove that their speech played at least a substantial part in the employer's decision to take an adverse employment action against them. If the plaintiffs can carry their burden on these two elements, the defendants can only prevail if they prove by a preponderance of the evidence that the government's interest, as an employer, in efficiently providing government services outweighs the employees' First Amendment interests, or if they can prove that they would have disciplined the employees even in the absence of the speech." *Id.* (citing *Klunk v. County of St. Joseph*, 170 F.3d 772, 775 (7th Cir. 1999); *Hellstrom v. United States Dep't of Veterans Affairs*, 201 F.3d 94, 97 (2d Cir. 2000)).

content is the most important." *Id.* (citations omitted); *Campbell v. Towse*, 99 F.3d 820, 827 (7th Cir. 1996). "The 'public concern' element is satisfied if the speech can fairly be said to relate to a matter of political, social, or other concern to the community, rather than merely a personal grievance of interest only to the employee." *Gustafson*, 290 F.3d at 907 (citing *Connick*, 461 U.S. at 146). If the speech is not on a matter of public concern, "it is unnecessary for us to scrutinize the reasons for [the employee's] discharge." *Connick*, 461 U.S. at 146.

The content of the speech at issue here was, quite plainly, a matter solely of Anderer's private concern. The speech concerned and addressed only Anderer's arrest; nothing in these statement alleges any greater societal impact than Anderer's possible grievance for being arrested, *Connick*, 461 U.S. at 147-48; *Gustafson*, 290 F.3d at 908. Anderer claims that his speech was a matter of public concern because "pervasive and systematic misconduct" in the Milwaukee police department leads to a high number of arrests of officers without probable cause and that bringing this to light was the motivation for the speech. We acknowledge that motive is relevant to the "matter of public concern inquiry, [though] it is not dispositive," *Gustafson*, 290 F.3d at 908 (citations omitted), but "speech on a subject that would be of interest to the public will not be protected if 'the expression addresses only the personal effect upon the employee.'" *Id.* (quoting *Marshall v. Porter County Plan Comm'n*, 32 F.3d 1215, 1219 (7th Cir. 1994)). And while we recognize that there are few matters "of greater public concern in a large metropolitan area than police protection and public safety," *Auriemma v. Rice*, 910 F.2d 1449, 1460 (7th Cir. 1990) (en banc), nothing in the speech at issue here addresses or seeks to resolve anything about what Anderer may or may not have believed regarding the police department's or Chief Jones's policies, other than his dissatisfaction with his arrest and his desire for personal redress. As such, his speech

cannot fairly be described as a "matter of public concern," and any further inquiry into why he was terminated is unnecessary given the wide latitude we afford government officials in managing their offices. *See Connick*, 461 U.S. at 146; *Driebel*, 298 F.3d at 638 (discussing internal affairs investigatory tactics employed by the Milwaukee police department).

## III.  CONCLUSION

For the foregoing reasons, the judgment of the district court is AFFIRMED.

COFFEY, *Circuit Judge*, dissenting.  Joseph Anderer, a recently discharged Milwaukee police officer, argues on appeal that his constitutional rights were violated when he was arrested, booked and detained, and subsequently terminated from his employment (3.5 years) on the orders of Chief Arthur Jones of the Milwaukee Police Department ("MPD"), based almost exclusively on the fabricated story of an incorrigible and psychotic juvenile, without a scintilla of corroborating evidence. The majority attempts to defend his arrest and refuses to accept Anderer's contention and argument—which finds full support in the record—that his accuser, an out-of-control juvenile named "JR," who also maliciously created another fabricated accusation against a second officer stating that he had raped him, was likewise wholly incredible. As the trial judge noted when finding JR incredible: "*[a]fter all, if J.R. could manufacture one obvious lie against an officer, he might also manufacture a more*

*plausible lie against another officer.*" *Anderer v. Jones*, No. 01-C-0668, at *6-7 (E.D. Wis., Sept. 30, 2002) (emphasis added). The reality of the situation is that the false information JR gave to investigators concerning Anderer's involvement in the alleged assault fell far short of establishing probable cause to arrest him and the investigators' belief in JR's veracity was just one component of a mishandled and goal-oriented (have Anderer arrested) investigation which lacked good-faith and which the majority now condones.

The majority also fails to recognize and avoids the fact that the investigation fell far short of a proper police inquiry, lacking in objectivity and fairness. Indeed, the Milwaukee Police Department, INTERNAL AFFAIRS DIVISION ("IAD") investigators looking into JR's false and malicious complaint, for reasons unexplained, saw fit *to systematically ignore the exculpatory statement* given by Officer Janice Shoman prior to Anderer's arrest and then proceeded to fail to timely interview four other police officers, Officers Cook, Centeno, Logan and Bohlen (all who would have given exculpatory statements), and one lay witness, Mitchell (who investigators *well knew prior to Anderer's arrest would have exonerated him*). *See infra* pp. 24-25, 28-30, 48-49, 57-58, 70-72.

There was absolutely no credible evidence uncovered by the investigators even suggesting that Anderer had committed a crime prior to his arrest. For example, Officer Shoman told IAD investigators prior to Anderer's arrest that she would have noticed any altercation whatsoever between Anderer and JR because of her close proximity to him if, in fact, it had taken place, and that she witnessed no such incident. Notwithstanding the exculpatory nature of this evidence, the majority distorts her testimony and cavalierly states that Shoman could not "refute" JR's story. Opinion at *12. Indeed, five of the six police officers present at the scene, when questioned, later did corroborate Shoman's statement when testifying under oath (affidavit) that Anderer did not strike JR while putting him in the squad car, as JR

had specifically stated that Anderer had done. *See infra* pp. 74-81. In the end, the only credible fact in the record that the majority cites to suggest that Anderer committed, or was committing, an offense is his failure to explain JR's alleged injuries. Anderer (as a police officer and American citizen) was well aware that his refusal and/or silence was fully protected under both his constitutional and contractual rights. The majority's attempt to use the police officers' repeated refusals to answer questions as a fundamental factor in establishing probable cause is completely misguided, for no one, not even a law enforcement officer, can be forced to give evidence against himself while the subject of a criminal investigation. Indeed, no court has ever held that the refusal to answer questions that might incriminate a suspect would allow law enforcement officers to elevate reasonable suspicion to probable cause based on such a refusal. *Cf. Hiibel v. Sixth Judicial Dist. Court*, 124 S.Ct. 2451, 2460-61 (2004); *see infra* pp. 52-54. The majority implies that since neither party raised this argument we do not have jurisdiction to address this constitutional question; however, I am confident the majority realizes that this Court does have the discretion to resolve a constitutional issue discovered in the record before us *sua sponte*, contrary to the majority's suggestion. *See* Opinion at *10 n.8. As the Supreme Court has made clear "[t]he matter of what questions may be taken up and resolved for the first time on appeal is one left primarily to the discretion of the courts of appeals, to be exercised on the facts of individual cases . . . . *Certainly there are circumstances in which a federal appellate court is justified in resolving an issue not passed on below, as where THE PROPER RESOLUTION IS BEYOND DOUBT, or WHERE INJUSTICE MIGHT OTHERWISE RESULT*." *Singleton v. Wulff*, 428 U.S. 106, 121 (1976) (emphasis added) (internal citations omitted); *See infra* pp. 63-65. I believe that it is our duty to do so. It is "well-settled . . . [that] [p]olicemen . . . are not relegated to a watered-down version of constitutional rights," *Driebel v. City of Milwau-*

*kee*, 298 F.3d 622, 637 (7th Cir. 2002) (quoting *Garrity v. New Jersey*, 385 U.S. 493, 500 (1967)), and we must not ignore the serious constitutional problems raised by using Anderer's silence as a factor establishing probable cause.

In addition, the majority, without explanation, refuses to accept the well known fact that there are maladies such as a plain, everyday nosebleed or those nosebleeds of the type frequently caused by the injestion of a myriad of prescribed psychotropic drugs and other medications *known and accepted* as causing and contributing to nosebleeds. *See infra* pp. 26-28, 46-47, 73-75, 86-88. This fact becomes even more germane when viewed in combination with the established evidence that the only person claiming Anderer committed a crime was the out-of-control JR himself; a swearing, cursing malcontent who, in his attempt to get even with the arresting police officers (*i.e.*, threatened that he would "get paid" and "have [their] jobs") accused one, Officer Cook, of rape and accused the other, Anderer, of striking him in the face and nose, causing him to bleed. *See infra* pp. 23-25, 30-31, 42-44, 51-52, 70-72, 86-88. However, JR's accusation flies in the face of common sense and logic because the lying juvenile burglar suffered no bruises, abrasions, lacerations, contusions, much less swelling to any part of his face, nose or lips which might give some credence to his allegation that he had been struck by a 200 lb. police officer. This is not to mention that in addition to the lack of physical signs of abuse on the purported victim, there are five credible witnesses who were present at the scene and stated that they never witnessed Anderer assault JR at any time, much less during the particular time frame when Anderer was assisting him with his entry into the squad car. *See infra* *p*p. 24-25, 28-30, 48-49, 57-58, 70-72, 75-81. Therefore, in light of the relevant facts and circumstances, Anderer's arrest was not predicated on information from a "reasonably credible witness or victim," as the trial judge found, nor does it qualify as being based on "reasonably trustworthy

information [that] would warrant prudent person in believing that [Anderer] had committed or was committing an offense." *Spiegel v. Cortese*, 196 F.3d 717, 723 (7th Cir. 2000) (quoting *Qian v. Kautz*, 168 F.3d 949, 953 (7th Cir. 1999)). In effect, the majority is taking the word of a psychotic, uncontrollable, lying juvenile over that of six credible witnesses and a plethora of very convincing circumstantial evidence.

Indeed, the trial judge went on to state that JR was not a credible witness. Judge Stadtmueller found that "J.R.'s statement alone [was] an insuffcient basis for probable cause." *Anderer v. Jones*, No. 01-C-0668, at *6-7 (E.D. Wis., Sept. 30, 2002). The majority disagrees with the trial judge's clear statement on the credibility subject and, in support of this holding, argues that JR told other officers that he made rape allegations against Cook and that he "told several police officers the same story." *See* Opinion at * 9, *12. However, the record reflects that once the investigation concerning Anderer ensued, (in contrast to the majority's contention) JR when interviewed never repeated his "rape" allegation, but claimed only that he had been "nudged" in the buttocks. Smith Report ¶ 5. Nevertheless, even if we were to assume, for purposes of this discussion, that JR did repeat his ridiculous allegations against Cook word-for-word to other officers, this does not *ipso facto* negate all of the other facts which rendered JR's allegations incredible and would, in fact, only serve to further undermine the value of the juvenile's description of events. *See infra* pp. 43-45.

The majority also attempts to characterize a number of post-arrest events as "irrelevant facts," such as: (1) "the Deputy District Attorney's later decision not to pursue criminal charges"; (2) "photographs of JR, as they were developed after Anderer's arrest"; and (3) "statements made by ID technicians after the arrest." See Opinion at *11 n.9. However, as we make clear, all of this evidence is used, not as part of a probable cause review, but to further establish

that the IAD investigators responsible for conducting the probable cause inquiry were neither being truthful nor fair and objective when they claimed that JR was "seriously injured" and that their investigation (which can best be described as no more than a rush to judgment) suffered from a serious lack of good-faith, resulting in an improper finding that probable cause existed to arrest the officer. *See infra* pp. 43-55, 83-85, 91-94 (discussing the deputy district attorney's decision not to prosecute); pp. 52-55 (discussing evidence and testimony given by the I.D. Technicians).

Because this case is so fact-oriented and because the majority's decision fails to provide an accurate representation of the record, I have been forced to recite the facts with corresponding record cites, as well as my reasoning and conclusion in detail. My purpose is not to provide a closing argument, as the majority for some reason saw fit to mockingly suggest,[1] but is an honest attempt to persuade my colleagues that the district court's decision should be reversed and set aside and that Anderer should, at the very least, be afforded his day in court in order that he might present his case to a jury of his peers and furthermore that a history of investigative problems of this nature in the Milwaukee Police Department might be exposed to the light of day. *See also Driebel v. City of Milwaukee*, 298 F.3d 622 (7th Cir. 2002).

## I. Factual Background

At approximately 7:28 p.m. on April 17, 2001, the Milwaukee Police Department received two telephone complaints, one from James C. Mitchell and the other from Eric Guenther, alerting the police that there was a burglary in progress aboard a boat at 2011 South First Street, the

---

[1] See Opinion at *11 n.9.

Pump House Marina (the "Marina"), on Milwaukee's South Side. Officer Anderer, the subject of this case and a 3 ½-year veteran on the Department, was assigned to work without a partner that evening and was dispatched to the crime scene with six other officers: Sergeant Michael Jones, and Officers Jeffrey Cook, Jeffrey Logan, Todd Bohlen, Victor Centeno, and Janice Shoman. These seven police officers, after arriving at the crime scene, and while conducting their investigation, came upon four juveniles (one African-American male, JR, and three white males) that had been observed breaking into a boat parked at a slip in the Marina and stealing a fire extinguisher and high-powered flashlight from aboard the vessel (burglary). Sergeant Michael Jones patted down the suspects and, with the assistance of Officers Jeff Logan and Jeffrey Cook, escorted the juveniles from the boat slip over to the Marina mainland for questioning.

As the officers were escorting the four juvenile burglars, JR became abusive, loud, and obscene and acted out in a most strange and "extremely obnoxious" manner. Cook Aff. ¶ 10. In the presence of Officers Logan, Cook and Anderer, JR began "yelling and screaming [obscenities]," ignored the Officers' commands, and during this time "accus[ed] [police officer Jeffrey Cook] of hitting him in the buttocks with the flashlight and *attempting to rape him*." Cook Aff. ¶ 10-12, 16 (emphasis added); Logan Aff. ¶ 10. When the juveniles reached the Marina mainland they were assembled for further questioning, and "JR . . . [again] accused [Cook] of attempting to rape him" (while possibly experiencing a psychotic episode or hallucination) and "continually screamed that he would get paid, that *he would get a check, and he would have [the police officers'] jobs*," Cook Aff. ¶¶ 12, 16 (emphasis added),[2] implying that he would sue the officers

---

[2]  JR's insolent behavior was not solely directed at Officer Cook; indeed, the child "call[ed] *all* the police officers at the scene ob-
(continued...)

for money and get them fired from the Department.

After the officers completed their questioning, the four juvenile burglars were arrested, handcuffed and searched. Cook Aff. ¶ 13. Officers Logan and Cook took three of the juveniles into custody, and escorted them to their squad, while Officer Anderer was assigned to escort the fourth individual, JR, to his single-manned squad car (possibly because it would be easier to separate the out-of-control, threatening, and foul-mouthed juvenile from the other three). James C. Mitchell, the citizen witness who had earlier reported the burglary to police, stood nearby and continued to observe Anderer and JR as the officer "guide[d and secured] [him] into the back seat of the squad, . . . [and] close[d] the door to the car . . . ." Mitchell Aff. ¶ 14. Mitchell heard JR continue to scream obscenities directed at the officers and continue to act out in an obnoxious and belligerent manner. Mitchell continued to observe Anderer as he escorted JR to the car, and testified that at no time did he witness Anderer strike the juvenile. Mitchell states in his affidavit that he:

> *[W]atched every step of the way while Officer Anderer was taking [JR] to his squad car* [and as] Officer Anderer guide[d] [JR] into the back seat of the squad, [he (Mitchell)] *saw Officer Anderer seatbelt JR, close the door securing him in the back of the squad* and . . . *[a]t no[ ] time did [he] see Officer Anderer strike [JR] or act in any abusive manner toward him*. . . [Instead, Mitchell observed that] *at all times . . . Anderer acted in a very professional manner [toward JR]*.

Mitchell Aff. ¶¶ 14-16 (emphasis added).

---

[2]  (...continued)
scene names . . . ." Cook Aff. ¶ 12.

Once Anderer positioned JR into the squad, he (Anderer) left the Marina and proceeded directly to the Second Precinct Police Station, which was only a stone's throw from the Marina (the recorded trip time was only two minutes and two seconds). Anderer Aff. ¶ 43. When Anderer's car arrived at the station, Officer Cook helped unload JR and noticed blood dripping onto the juvenile's chin. Cook Aff. ¶ 26. When Sergeant Michael Jones approached JR and asked why he was bleeding, JR continued his pattern of false accusations and in a flippant and offhand manner (while laughing and joking with the three other children) "point[ed] [at] Officer Anderer [and stated], '[t]hat officer hit me,' and then pointed at [the other officer,] Cook and stated, 'that officer raped me.'" *Id.* ¶ 30. Upon further questioning, and in the presence of Sergeant Jones and Officers Cook and Anderer, JR voiced his claim that Anderer "'hit [him] when he put [him] in the [squad] car.'" Sgt. Michael Jones Aff. ¶ 6. JR went on to allege that *as Anderer was securing him in the squad car*, "he said something to [Anderer]," who "told him 'don't get smart' and [then] hit him one time [on] the mouth and nose [and] g[ave] him a bloody nose and bloody lip." JR's Citizen's Complaint ¶ 5.

As the police were commencing their investigation into the burglary charges against the juveniles (including JR), they became aware of information concerning JR's mental health problems and his history of run-ins with the police. This fully confirmed by that point what should have become clear—*that JR, the juvenile burglary arrestee, was at best a most highly incredible and suspect claimant*. Specifically, police, at this time, learned from JR's mother that her son, on that very day, had failed to take *any of his prescribed drugs* (five or six different prescriptions).[3] Cook Aff. ¶ 35.

_____

[3] According to Officer Logan, the information that JR was on psychiatric drugs "put everything in perspective," because JR had

(continued...)

And given the type of drugs prescribed for JR, police in-
vestigators were well aware that at least two of those drugs,
the ones Cook recognized, were used to treat JR's *psychiat-
ric and behavioral disorders*.[4] Moreover, JR's mother made
it clear to the officers that these prescription drugs were
vital to her son's mental well-being, and she urged the
officers to "release[ ] [him] from custody as soon as possible"
in order that he might ingest his medication immediately.
Cook Aff. ¶ 34. Considering JR's out-of-control, belligerent
and obnoxious behavior that night and combined with the
revelation that he had failed to take a number (3) of his
prescribed psychotropic drugs that very day, investigators
should have viewed all of JR's statements with caution and
skepticism.

As if this were not sufficient reason to raise a red flag of
suspicion and serve to discount JR's false and malicious
accusations, the investigating officers, at this time, also
became aware that this was not JR's first run-in with the
law. Officer Shoman informed the IAD investigators that JR

---

[3] (...continued)
not seemed "right" to him "from the beginning[,] as his behavior
was way out of line." Cook Aff. ¶ 31.

[4] In fact, *three* of the prescribed drugs JR was taking are used to
treat mental disorders: *Paxil (which treats depression, anxiety,
and obsessive compulsive disorder*, *see* "What Does Paxil Treat?",
*available at* http://www.paxil.com/about/ab_trt.html*); Seroquel
(which treats schizophrenia and which would help control the
voices HR was hearing, see* "Understanding Seroquel," *available
at* http://www.seroquel.com/cons_asp/undersero/undersero.asp*, as
well as symptoms such as hallucinations, see* "About Medications:
Seroquel," *available at* http://www.naminys.org/ abmed_ser.htm); and
*Adderall (which treats attention-deficit hyperactivity disorder*, *see*
"Adderall XR Q&A," *available at* http://www.adderallxr.com/
adderallxr_adderallxr.html). *See* Dr. O'Grady (psychiatrist)
Report, Anderer Aff. Ex. 30, at 2 (noting that JR was on Paxil,
Seroquel, and Adderall).

was a known trouble-maker who had proven to be a _constant problem_ in her patrol area. Shoman Aff. ¶ 6. Shoman's account of JR's problems with the law was further corroborated by his own mother, who stated to the officers that she was "not [at all] surprised" that her son had been arrested for burglary. Cook Aff. ¶ 32. The fact that JR had prior run-ins with the law, and that his mother was not suprised he had been arrested, should have further served to put in question and possibly discredit JR's fabricated story and again cause each one of the officers involved to question the veracity of this psychotic and out-of-control juvenile.

In addition, the complete lack of any physical trauma to JR's face (not one mark, contusion, abrasion, or bruise) fell far short of supporting his allegations that he was punched in the mouth and nose by a 200 lb. male. I.D. Technician David Brown, who photographed JR at 10:05 p.m. that same night (while the police investigation was in progress) noted that the only visible injuries on JR's body were the two cuts inside his mouth (upper and lower lip), which "looked to [be] _nothing more than . . . **pre-existing dried[-up] lip[s]**_ that cracked open just like lips do in the winter," Brown Aff. ¶ 15 (emphasis added) and which JR himself could have intentionally bit open with his teeth. Indeed, Brown stated that, in his opinion, JR's inner lip cuts were "_not caused by a punch_." _Id._ ¶¶ 5, 6. Interestingly, when Brown was subsequently informed that "officer [Anderer] had just been arrested for allegedly punching [JR]," I.D. Technician Brown "_told those [police] officers they must be kidding, [because he (Brown)] had [just] taken pictures of [the] kid [JR] and there were no injuries on JR . . . ._" _Id._ ¶¶ 14-15 (emphasis added).

Kara Kathrein, who had _in excess of nine years experience with the MPD_ and _more than three years specializing as an I.D. Tech while on the MPD_, took pictures of JR on the morning of April 18, 2001, at 1:30 a.m. and, like Brown,

testified in a sworn affidavit that the "small cut to [JR's] lower lip" was a "very minor injury" and "*was not consistent with being struck in the face by an adult male*." Kathrein Aff. ¶¶ 14-16 (emphasis added). Moreover, she stated that "*there were no observable injuries to JR other than the cut to his lower [interior] lip.*" *Id.* ¶ 17 (emphasis added). Because Kathrein had such extensive experience photographing and observing victims of abuse (she "ha[d] [previously] taken *many* photographs of injuries caused to victims by battery") and because *she was of the "opinion that the injury JR allegedly sustained was not consistent with being struck in the face by an adult male*," *id.* ¶ 16, *Kathrein stated that she was "surprised [when she learned] that JR's allegations le[d] to an officer's arrest* . . . ." *Id.* ¶ 20 (emphasis added).

Also, *it is most interesting and convincing to note that the record is barren of even one report of any finding of any traces of blood or any type of abrasion, bruising, scratches or other evidence of trauma on either of Officer Anderer's hands much less any evidence of blood, tears, dirt, or debris on his uniform or hands*—investigators performed a thorough inspection of Anderer's hands with a high-powered flash-light at Anderer's insistence, and furthermore had ample opportunity to inspect his clothing. *See* Smith Report at 9; Anderer Aff. ¶ 98. Indeed, it was Anderer himself who requested that an I.D. Technician take pictures of his hands to document the fact that they were neither bruised, marked, cut, nor injured in any manner. Anderer Aff. ¶ 81. This request was summarily rejected by IAD Detective Mercedes Cowan, who had arrived at the Second Precinct Police Station just a few minutes earlier with Lt. Hoerig; however, she did examine Anderer's hands with a high-powered flashlight when concluding that he didn't "need a photo tech." *Id.* at ¶ 85-98. Evidence suggesting that Anderer's hands were in pristine condition is consistent with Sergeant Jones' statement to Detective Harrison when he

stated that he had "s[een] *no evidence of any physical fight [between Anderer and JR;] [n]or [any] injury to the juvenile*" at the arrest scene. Jones Aff. ¶ 3 (emphasis added).

In addition, investigators *were aware*[5] that a bystander, citizen James Mitchell, was present on the scene at the time the incident allegedly took place, and was willing, able and available to provide exonerating testimony delineating the professionalism that Anderer exhibited while directing JR to, and placing him in, his squad car. However, *for reasons unexplained, investigators, who had knowledge that Mitchell*

---

[5] Both Anderer and Mitchell state in their affidavits that they informed **numerous** MPD officers and investigators (at least three, including Sergeant Jones and Detective Harrison) of Mitchell's contact information, and Anderer furthermore informed Detective Harrison exactly the nature and scope of the information Mitchell could provide—namely, that Mitchell *"[had] watched [Anderer] place JR into the squad and could [testify] that [he] did not hit th[e] [juvenile]."* Anderer Aff. ¶ 77 (emphasis added).

Furthermore, since the majority claims to be "puzzled" by my reference to some of the affidavits in the record (noting that these affidavits were "signed after Anderer's arrest"). Opinion at *11 n.9. I must note that time is not wasted at the scene of a police investigation making out affidavits and swearing to the same—particularly in a case such as this, in which the investigators invoked a jet-speed arrest procedure, investigating and proceeding to arrest Anderer with remarkable haste. Nevertheless, all of the observations were made contemporaneously with the events detailed herein and all of the affidavits provided to the court and contained in the record were submitted by duly sworn individuals under oath, and each statement has been signed, sworn and notarized in compliance with the rules and regulations thereof and the MPD.

*would exonerate Anderer,[6] neither conducted an in-person interview of Mitchell nor did they even bother to pick up the phone to call and ask any questions of him at any time prior to Anderer's arrest and confinement*. *Why*?

Completely disregarding the wealth of factors mitigating against JR's reliability, trustworthiness and honesty, as well as the lack of even a scintilla of proof anywhere in the record that JR had been injured by Anderer, Lt. Hoerig determined there was probable cause to arrest Anderer at the close of her alleged investigation. At this time Hoerig recommended to Chief Jones that Anderer be arrested for child abuse, based exclusively upon her findings, as set forth in her affidavit testimony as follows:

(a) "JR was 12 years old";

(b) "JR was not injured at the time he was turned over to Officer Anderer to be conveyed to the Second District station in Anderer's squad";

(c) "JR was in Anderer's custody exclusively while conveyed to the Second District station";

(d) "JR was handcuffed in the back of Anderer's squad when he was conveyed to the Second District Station";

(e) "JR had injuries consistent with being hit in the mouth when he arrived at the Second District station [sic]";

(f) "JR IDENTIFIED OFFICER ANDERER AS THE POLICE OFFICER THAT HIT HIM IN THE MOUTH";

---

[6] *See infra*, pp. 48-49, 57-58, 70-72.

    (g) "ANDERER DID NOT EXPLAIN HOW JR WAS INJURED"; and

    (h) "Anderer did not report use of force involving JR or any incident involving JR, or any injury to JR"

Hoerig Aff. ¶ 16. However, at least four officers, not including Anderer (Cook, Shoman, Centeno, and Bohlen), two I.D. Technicians (Kathrein and Brown), and one lay witness (Mitchell) came to conclusions that were in stark contradiction to Hoerig's. Indeed, Hoerig also falsely reported that JR had been "serious[ly]" injured, yet Hoerig neither saw fit to have JR evaluated by a medical professional nor to convey the juvenile to a hospital so that he could be treated if necessary (as the MPD rules and regulations and Wisconsin law would have required her to do if in fact JR had truly been "serious[ly]" injured). *See*, *e.g.*, *infra* p. 71 note 21, and accompanying text.

    After Hoerig informed Chief Jones of her recommendation, at 12:30 a.m., without any investigation into JR's obvious and self-evident mental troubles or medical history (of which investigators were on notice), without attempting to solicit statements from any other officers (Centeno or Bohlen—Cook had refused to make any statement without representation, as did Anderer, and Shoman had said she did not witness any fight between JR and Anderer and that JR was a constant problem in her patrol area) or the citizen witness (Mitchell) at the scene, and without even considering seeking the counsel of the DA or his Deputy,[7] Chief

---

[7] We again call attention to the fact that, as we noted in *Driebel*, the more desirable practice during criminal investigations involving law enforcement officers is for MPD officials to meet with a representative of the district attorney's office *before* proceeding

(continued...)

Jones went full speed ahead and ordered police detectives Smith and Harrison to place Anderer under immediate arrest. Anderer was then booked, fingerprinted and confined in jail for nearly 12 hours on a malicious (and fabricated) charge of physical abuse of a minor.

Anderer was released without bail at noon the next day without having any criminal charge brought against him. Some sixty days later, in the first week of June 2001, "[Lt. Hoerig] was notified by Deputy District Attorney Jon Reddin that *the case involving . . . Anderer and [JR] would be no processed[8] . . . BASED ON THE FACT THAT THE CASE LACKED PROSECUTABLE MERIT*," and, in fact, the criminal prosecution of the case was closed without any misdemeanor or ordinance violation, much less criminal felony, charges being brought against Officer Anderer. *See* Hoerig Aff., Ex. 1001 at 2-3 (emphasis added). Thus, Lt. Hoerig and Chief Jones were both rebuffed by the Deputy DA's decision refusing to bring criminal charges against Anderer.

On June 11, 2001, despite Deputy District Attorney Jon Reddin's outright refusal to charge Anderer with any crime,

---

[7] (...continued)
to arrest any officer under investigation—and, at that time, "inquire whether the prosecutor acting independently is likely to press charges against the officer." *Driebel*, 298 F.3d at 645 n.13. This is for the simple reason that "[a]n arrest is rarely made unless charges are likely to be brought." *Id.* Although *Driebel* was decided after the events that gave rise to this case had taken place, we again advocate this procedure in order that the arrest of a police officer, in spite of a complete vacuum of corroborating evidence, may be averted. *See id.*

[8] The formal explanation for this action, "*nolle prosequi*," is the bringing of a motion before a judge on the part of a prosecutor to "voluntar[ily] withdraw[ ] . . . [all] proceedings on a criminal charge." *See* BLACK'S LAW DICTIONARY (6th Ed.).

Chief Jones, not satisfied with that result, saw fit to _re-open and continue_ the criminal investigation into JR's false and malicious accusations against Anderer on his own initiative. At this time the Chief, offering a hollow excuse, stated as the reason for continuing his harassment of Anderer that he "wanted to make sure the investigation was complete and . . . the investigating officers had not missed any facts." Jones Aff. ¶ 10.[9] Lt. Hoerig was then instructed by Chief Jones to "re-interview all parties involved in this case." _See_ Hoerig Aff., Ex. 1001 at 3 (emphasis added). However, in her summary report after completing the second Anderer investigation, Hoerig stated, upon completing these interviews, that she had failed to turn up "[any] information" to merit "further criminal prosecution" of Anderer. _Id._

---

[9]  It is interesting to note that Chief Jones, by his own admission, had forwarded the case to the Deputy District Attorney Jon Reddin _without_ having assured himself that he had a complete investigation report before him—for even he himself was _purportedly_ concerned that his investigators might have "missed any facts" (In reality, this is an admission by Chief Jones that he ordered the arrest of one of his duly sworn officers in spite of the fact that he had not conducted a complete and through investigation). Jones Aff. ¶ 10.

In any case, Chief Jones's unrelenting insistence on again re-investigating JR's claim for a _third_ time—even after the initial police investigation, as well as the Deputy District Attorney's investigation, failed to uncover sufficient evidence to prosecute, and in light of Deputy District Attorney Jon Reddin's previous express refusal to prosecute—was (at best) a _most unusual_ occurrence. As a former police officer, Bradley DeBraska, now the president of the Milwaukee Police Association, stated in his affidavit: "this [wa]s the first and only time [he] ha[d] [ever] seen any _police chief restart a criminal investigation after it ha[d] been closed by the District Attorney's office_." DeBraska Aff. ¶ 17 (emphasis added).

Chief Jones—in an obvious last-ditch effort to have Anderer criminally prosecuted (with all his authority as the Chief of Police of a large department) went over the head of the Deputy District Attorney and now personally requested that the District Attorney himself, Mr. E. Michael McCann, review and re-evaluate his Chief Deputy's (Jon Reddin's) prior decision not to prosecute; now, a *fourth (second independent) investigation into the malcontent juvenile burglar and troublemaker JR's fabricated and flippant allegation* ensued. After independently reviewing and considering all of the information, McCann also refused to pursue any criminal charge, and "informed [Jones] that *the District Attorney's office would not change its prior no-charge decision.*" Jones Aff. ¶ 12 (emphasis added). In explanation of why he chose to uphold the Deputy DA's (Reddin's) prior decision refusing to prosecute the meritless case, McCann provided Jones "with a copy of a confidential memorandum written by . . . Reddin dated June 7, 2001," *id.*, in which Reddin stated:

> I have interviewed [JR], Anderer, officers Janice Shoman, Jeff Cook and Jeff Logan, and civilian James Mitchell. Based on those interviews *I have concluded that we cannot prove how and by whom [JR]'s injuries were incurred, and consequently [I conclude that] no criminal charges can be sustained*. . . . Whether Anderer struck him or he inflicted the injuries to himself by smashing his face into something in the back of the car will probably never be known to anyone but [JR] and Anderer. I cannot say with any assurance what happened. I believe it more probable, particularly in view of my knowledge of prior complaints against Anderer, that Anderer did strike [JR]. It is entirely conceivable, however, given [JR]'s agitation, mental problems and stated intentions to get money out of this incident, that he inflicted the injuries to himself.

Jones Aff., Ex. 1002 at 1-2 (emphasis added).[10] Thus, after Jones personally requested, on two separate occasions, that criminal charges be filed against Anderer, the chief law enforcement officer in Milwaukee County, District Attorney E. Michael McCann, and his Chief Deputy Jon Reddin *both* found no merit to the charges and declined to prosecute Anderer.

On July 2, 2001, probably to clear his name and reputation, and to save his family from further disgrace and humiliation, Officer Anderer filed a lawsuit against Chief Jones, the IAD and the MPD command officers who investigated JR's claims (Lt. Hoerig, Detective Mercedes Cowan and Deputy Inspector Charles Grisham) for violation of his constitutional rights. Chief Jones (possibly in a retaliatory manner) directed the new commander of the IAD, Steven Settingsgaard, on July 6, 2001, (*a mere 96 hours after Anderer filed his lawsuit*, and approximately a month after District Attorney E. Michael McCann's final decision not to institute criminal charges against Anderer) to institute internal charges against Anderer alleging that he had *violated MPD Rule 4, Section 2/455.00[11] on the purported*

---

[10] I have reviewed Anderer's complete file in the record and realize that he has a less than exemplary employment history including other instances of alleged suspected misconduct during his career. However, I am of the opinion that it was unnecessary and ill-advised for Reddin to make any reference to past (suspect) complaints against Anderer. I am confident any alleged previous complaints should not be, and were not, a factor in Reddin's decision to prosecute or not to prosecute Anderer. Reddin understood, as I do, that any incidents contained in Anderer's previous complaint file should not have been considered, and have absolutely no bearing on the probable cause issue. *Cf. United States v. Jerez*, 108 F.3d 684, 693 (7th Cir. 1997).

[11] MPD Rule 4, Section 2/445.00 reads: "Members of the police
(continued...)

*basis that he unnecessarily struck JR on April 17, 2001. This, in spite of the fact that Lt. Hoeirg's second investigation and two independant investigations by the D.A.'s office, one by Deputy District Attorney Reddin and the other by District Attorney E. Michael McCann himself, failed to uncover evidence which would support criminal charges of any kind.* In bringing this back-up internal child abuse charge, Chief Jones once again exhibited his unrelenting determination to remove Officer Anderer from the force, and finally succeeded in having him terminated on July 17, 2001.

Given that *four investigations* (two by the MPD's Internal Affairs Divison, one by the Deputy District Attorney Jon Reddin (who concluded that "he could not say with any assurance what happened") and an additional review of the matter by District Attorney E. Michael McCann failed to uncover evidence to sustain any type of felony or misdemeanor criminal charge against Anderer, and considering no person alive witnessed the alleged blow to JR's mouth or nose other than the unruly psychotic juvenile himself, *Chief Jones's continued his unrelenting insistence on getting Anderer off the police force by pursuing a rules violation charge against Anderer was at best a most shocking display of continued harassment and bad judgment. At worst, as the*

---

[11] (...continued)
force are strictly forbidden to argue with prisoners, to speak to them unnecessarily, to address them in obscene or profane language, or to threaten them. Members of the police force guilty of unnecessarily striking or manhandling a prisoner or mistreating them in any manner shall be subject to dismissal. A member of the police force having supervision of any police building, bureau or office, to which prisoners are conveyed or in which they are detained, shall be responsible for the proper and humane treatment of such prisoners."

*timing of his bringing this charge implies (a mere 96 hours after Anderer filed suit against the MPD), this constituted an example of retaliation reflecting poorly not only on the Chief of the Department, but on each of the individual officers of the MPD who participated in this speedy, lightning-like, careless, and almost pre-determined investigation, arrest and subsequent termination decision. In any case, the questionable conduct during the investigation and filing of the internal MPD rules and regulations charges, resulting in Anderer's dismissal, casts a dark cloud of suspicion over Anderer's initial arrest as well as the entire contrived and orchestrated procedure, and only serves to strengthen Anderer's claim that the MPD's internal investigation into the matter was unreasonable and lacking in good-faith, and that his arrest was not based on probable cause.*

## II. Analysis

The Rule 56(c) summary judgment standard provides for the granting of summary judgment *only* when "*the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.*" Fed. R. Civ. P. 56(c) (emphasis added); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Said differently, summary judgment is only proper where "a rational trier of fact [could not] find for the non-moving party," here Anderer. *See Wolf v. Northwest Indep. Symphony Soc'y*, 250 F.3d 1136, 1141 (7th Cir. 2001). Of paramount importance in this case is that "[i]n reviewing the propriety of a district court summary judgment ruling under Fed. R. Civ. P. 56, we review de novo and adhere to the same standards as the district court set forth in its memorandum opinion and order." *Dykema v. Skoumal*, 261 F.3d 701, 704 (2001) (internal

citations omitted) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). Also, it is critically important, in the instant case, to recall that "**[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [Anderer's] favor**." *Id.* (citing *Anderson*, 447 U.S. at 255).

### A.  The District Court's Determination that Probable Cause Existed

It is well-settled that a law enforcement officer has probable cause to make an arrest *only* when " 'the facts and circumstances within [his] knowledge and of which [he has] reasonably trustworthy information [are] sufficient to warrant a prudent person in believing the suspect has committed or is committing an offense.' " *United States v. Mounts*, 248 F.3d 712, 715 (7th Cir. 2001) (quoting *United States v. Gilbert*, 45 F.3d 1163, 1166 (7th Cir. 1995)). Keeping in mind that the resolution of a probable cause question *"typically falls within the province of the jury*," *Lanigan v. Village of East Hazel Crest*, 110 F.3d 467, 473 (7th Cir. 1997) (emphasis added), it is appropriate for a court to conclude that probable cause exists as a matter of law only "when *THERE IS NO ROOM FOR A DIFFERENCE OF OPINION* concerning the facts or the reasonable inferences to be drawn from them." *Id.* (emphasis added).

In this case, the trial judge stated:

JR'S STATEMENT ALONE IS AN INSUFFICIENT BASIS FOR PROBABLE CAUSE . . . . ANDERER RAISES SERIOUS ISSUES CONCERNING JR'S CREDIBILITY BY SHOWING THAT JR MADE FANCIFUL ALLEGATIONS AGAINST ANOTHER OFFICER. AFTER ALL, IF JR COULD MANUFACTURE ONE OBVIOUS LIE AGAINST AN OFFICER, HE MIGHT ALSO MANUFACTURE A MORE PLAUSIBLE LIE AGAINST A DIFFER-

ENT OFFICER. WITHOUT MORE THAN JR'S WORD, THEREFORE, ISSUES OF FACT EXIST AS TO WHETHER A REASONABLE OFFICER WOULD HAVE CONCLUDED THERE WAS PROBABLE CAUSE TO ARREST ANDERER. . . .

*Anderer v. Jones*, No. 01-C-0668, at *6-7 (E.D. Wis., Sept. 30, 2002) (emphasis added). As evinced by this statement, the trial judge found no credence in JR's allegation, as the judge properly recognized that JR's demonstrated propensity to lie rendered his abuse claim against Anderer suspect and untrustworthy. Thus, the trial court concluded that, "*JR'S STATEMENT . . . [WAS] UNRELIABLE*" *Id.* at *9.

In spite of this clear single phrase in the statement of his findings, the district court judge ultimately took an end run around the established facts and proceeded to do a curious flip-flop, somehow holding that there *was* probable cause to arrest Anderer in light of other facts. Specifically, the district court anchored its speculative probable cause finding on "THE BLOOD ON JR'S FACE AND SHIRT . . . AS WELL AS THE TIME IN WHICH ANDERER WAS ALONE IN HIS SQUAD CAR WITH JR, AND ANDERER'S INABILITY TO EXPLAIN JR'S NOSEBLEED." *Id.* at *8 (emphasis added). The trial court found that these circumstances "would have given a prudent police officer probable cause to arrest Anderer." *Id.* I disagree.

I am of the opinion that a consideration of the totality of the evidence available to investigators at the time of Anderer's arrest would have failed to convince a "prudent person" that "an offense" had been committed (that Anderer had hit JR). *See Mounts*, 248 F.3d at 715; *see also Beauchamp v. City of Noblesville*, 320 F.3d 733, 743 (7th Cir. 2003). As discussed *infra*, prior to Anderer's arrest, JR never claimed that he was struck during the time frame he was alone with Anderer in the squad car on the way to the station. Also, I must note that, although the trial judge, in his decision, cited the

blood on JR's shirt as evidence of abuse, *no testing was ever performed verifying that the stains were fresh blood.* Indeed, the I.D. Technicians stated that the blood stains did not look "real fresh" and that "JR's clothing and coat had been soiled and appeared to have been worn for several days." Brown Aff. ¶ 16; Kathrein Aff. ¶ 13. Anderer agreed, stating that JR's "clothes had ground-in dirt and looked very worn." Anderer Aff. ¶ 28. The fact that some of the blood on JR's shirt did not appear "fresh" suggests that JR had been experiencing nose bleeds in the days and hours leading up to his arrest and, thus, the presence of blood on JR's shirt does nothing to advance the theory that Anderer struck the juvenile.

Furthermore, although the district court and the majority made much of the fact that no witnesses observed blood on JR's shirt at the arrest scene, *see* Opinion at *12, it should be made clear that when the officers "first observed JR [at the Marina], [the juvenile] was wearing a hooded jacket with Japanese writing and *WAS ZIPPED CLOSED*." Logan Aff. ¶ 11 (emphasis added). The fact that JR's jacket was zipped closed, as Logan stated, explains why none of the witnesses observed blood, most probably from past nose-bleeds, on JR's shirt at the Marina. Therefore, such obser-vations (or the lack thereof) do absolutely nothing to cor-roborate JR's claim of abuse, contrary to the district court and the majority's contention. *See* Opinion at *12 ("both [Sgt. Jones and Officer Shoman] stated that JR was not bloody at the time he had been turned over to Anderer's sole custody").

Also, any reference to Anderer's "inability" (refusal) to ex-plain the nosebleed suggests that the trial judge must not have been aware of Anderer's right, as a suspect of a criminal offense, to protection under the Fifth Amendment to the United States Constitution which entitles him to refuse to give a statement that might be used against him in a criminal proceeding, nor of his contractual employment

right not to make a statement without a representative present. *See* MPD Manual, Anderer Aff., Ex. B. The record is barren of, and there is no possible explanation by the trial judge, as to why and how he believed Anderer's refusal to give a statement could be used as a prong of the foundation for his finding of probable cause.

## B.  JR's Lack of Credibility

The majority would like us to affirm the district court's unfathomable and unexplained grant of summary judgment to the Defendants, on the basis that, "as long as a *reasonably credible* witness or victim informs the police that someone has committed, or is committing, a crime, the officers have probable cause to place the alleged culprit under arrest . . . ." Opinion at *8 (emphasis added) (quoting *Spiegel v. Cortese*, 196 F.3d 717, 723 (7th Cir. 2000)). I am forced to disagree with the majority's unsupported contention that JR was a "reasonably credible" witness. The juvenile, JR, under the facts and circumstances set forth herein, could not be classified as reliable or trustworthy, much less reasonably credible. Thus, what the majority fails to take into consideration is that the fictitious claim made by the 12-year-old juvenile in this case—*THAT OF A PSYCHIATRICALLY CONFUSED DELINQUENT JUVENILE ACTING OUT-OF-CONTROL WITHOUT THE BENEFIT OF HIS PRESCRIBED PSYCHOTIC MEDICATION*—was found by the trial judge *"NOT [TO BE] SUFFICIENTLY RELIABLE OR TRUSTWORTHY."* And unlike the majority, I refuse to cast aside and pay no heed to that portion of the trial judge's specific finding that JR was *NOT a reasonably credible witness*; for this (lack of) credibility determination by the trial judge is well established in the record.

Based upon the facts and circumstances set forth herein, it is imprudent and most ill-advised for the majority to rely on the juvenile's complaint and such highly questionable

facts surrounding JR's statements to conclude that probable cause existed to arrest Officer Anderer. *See* Opinion at *10. I understand that, generally, the "complaint of a single witness or putative victim alone [is] generally . . . sufficient to establish probable cause," <u>EXCEPT IN THOSE IN-STANCES WHERE THE "COMPLAINT [BY ITSELF] WOULD LEAD A REASONABLE OFFICER TO BE SUS-PICIOUS," for in those cases "THE OFFICER HAS A FURTHER DUTY TO INVESTIGATE</u>." *Beauchamp*, 320 F.3d at 743 (emphasis added). As this Court explained in *Hebron v. Touhy*, 18 F.3d 421 (7th Cir. 1994):

> *<u>Sometimes information from or about a person claim-ing to be the victim of crime would lead a reasonable officer to be suspicious</u>*, making further investigation prudent—and, because the "reasonableness" standard of the fourth amendment links the constitutional obli-gation to the standard of prudent conduct, *<u>the officer must do more.</u>*

*Id.* at 422-23 (emphasis added). Therefore, I must point out that while I fully understand that " 'the law does not require that a police officer conduct an incredibly detailed inves-tigation at the probable cause stage,' " *Spiegel*, 196 F.3d at 724-25 (quoting *Gerald M. v. Conneely*, 858 F.2d 378, 381 (7th Cir. 1988)), certainly in the investigation of a situation such as the one presented to us, which could and did result in a grave injustice—Anderer's arrest (and his ultimate termination from the police force), an investigating officer "*<u>SHOULD CONDUCT FURTHER INVESTIGATION" espe-cially when he or she is aware of certain "information from or about a putative victim of crime [that] WOULD LEAD A REASONABLE OFFICER TO BE SUSPICIOUS.</u>*" *Id.* at 724 (emphasis added).

The record establishes that the investigating officers possessed *more than ample* information that would and should have led a well-trained and competent officer, ex-

ercising reasonable judgment based upon the knowledge he or she possessed, to be *suspicious* and *most cautious* of young JR's fabricated allegation of abuse. This, in turn, *should have mandated that the officers go forward and perform a good-faith investigation in an unbiased, fair and objective effort to satisfy the probable cause standard*. However, there is no evidence in the record that IAD officers were cautious or suspicious, much less objective; for they never even took the simple step of checking JR's juvenile court contact record, but instead accepted JR's fabricated allegations at face value. As noted above, JR was shouting obscenities and threats, as well acting in an out-of-control and very strange manner on the night of the incident, for in addition to off-handedly remarking that Anderer had hit him in the mouth, JR *repeatedly stated, in front of a number of other police officers, that Officer Cook had raped him (possibly hallucinating), and repeatedly inferred that he would sue ("get money") and get the arresting officers, including Cook and Anderer, fired*. The mentally disturbed JR (who had not ingested his psychiatric medication that day) had a clear motive to make up a malicious lie in order to "harm others" and get Anderer and Cook in trouble, and thus was unworthy of belief concerning his "rape" allegation against Cook and his abuse allegation against Anderer. Again, as the trial judge aptly found, "if JR *could manufacture one obvious lie against an officer, he might also manufacture a more plausible lie against a different officer.*" *Anderer v. Jones*, No. 01-C-0668, at *7 (E.D. Wis., Sept. 30, 2002) (emphasis added). As I stated earlier, I wholeheartedly agree with that part of the district court's finding and statement that JR's allegation of abuse does fall far short of fulfilling the good-faith standard required to establish probable cause.

Also, the majority's contention that "JR told several police officers the same story," Opinion at *9, is inaccurate and misleading; for the record reveals the contrary, *i.e.*, that JR

was *neither* truthful nor forthcoming with the IAD investigators about his previous rape allegations against Cook. At the Marina, the scene of the burglary, after JR had been apprehended by Officer Cook, he began "screaming and yelling and accusing [Cook] of attempting to rape him." Cook Aff. ¶ 11. JR also continued his barrage of obscenities and threats by stating that Cook was a "f***ing pig and I'm going to get you." Hoerig Aff., Ex. 1001 at 25. Once again, after JR had been transported to the Second Precinct Police Station, JR again accused Cook by pointing at him and stating "that officer raped me." Cook Aff. at ¶ 30. However, once the investigation into the allegations against Anderer commenced, at no time did JR repeat this absurd and ridiculous rape allegation to IAD investigators. Instead, JR only stated to them that Cook "*nudged him on his buttock with a flashlight.*" Smith Report ¶ 5 (emphasis added). *This statement (that Cook had "nudged" him in the buttock) was in all likelihood more "true" than JR's "obvious lie" that Cook raped him, but it does not support the majority's conclusion that* "JR told several police officers the same story . . . ." Opinion at *9. Moreover, even if JR *had* repeated his prior rape statement to the investigating officers—rather than *restore* his credibility, *the juvenile's willingness to repeatedly make a specious rape claim against police officers (which the district court judge termed as an "obvious lie"), if anything, would have served to further diminish JR's credibility concerning his concomitant child abuse allegation*.

As for the very powerful evidence that JR was presently, and in the immediate past had been, undergoing treatment for psychiatric and behavioral problems which necessitated the prescription of a myriad of psychotropic drugs—*and that he had failed to take his medicine on the day in question (the very day he participated in the boat burglary, levied false allegations of rape and abuse against Cook and Anderer, made numerous threats of harm against the arresting officers and somehow ended up with a bloody nose and accused a police*

*officer of causing it*) should have raised the red flag of caution and suspicion for investigators—the majority says only that "the fact that the investigating officers knew about JR's psychiatric medication does not *ipso facto* negate JR's credibility or require the officers to further investigate JR's medical history to substantiate or refute his claim of abuse by Anderer." Opinion at *11. No one says now, or at any time, that this one fact alone would even be sufficient to refute the abuse claim. Surprisingly, in an attempt to support their assertion, the majority relies on this Court's holdings in *Dreibel v. City of Milwaukee* and *Spiegel v. Cortese. See* Opinion at *11. But *Dreibel* is wholly inapposite, for in that case (unlike the instant case), the purported victim's allegation that he was struck by a police officer was bolstered by "*numerous witnesses* who [were allowed to] g[ive] [more than] sufficient corroborating testimony to establish that [the police officer] may have committed a battery . . . ." *Dreibel*, 298 F.3d at 644 (emphasis added). Yet, in this case, not one living, breathing individual corroborated JR's allegations of abuse. *ARE WE REALLY TO BELIEVE THAT ANDERER, ALL FOUR OF HIS FELLOW OFFICERS (WHO WERE ON THE SCENE) AND MITCHELL ARE ALL LIARS?* Moreover, there was absolutely nothing to interfere with the MPD and Chief Jones from waiting a few days, or even weeks, while they pursued their investigation and gathered sufficient evidence about the allegation. At the very least they should have consulted with the independent senior law enforcement officer of the county, *i.e.*, the D.A. or his representative, before taking the most serious step of subjecting Officer Anderer to arrest (as is the department's *modus operandi* for an investigation into an alleged crime with accompanying serious consequences), confinement and ultimate discharge.

The majority's reliance on *Spiegel* is likewise inappropriate, for the complainant in *Spiegel* was found to be reasonably credible, despite "inconsistent" statements to officers.

*See* Opinion at \*11; *Spiegel v. Cortese*, 196 F.3d 717, 724 (7th Cir. 2000). By contrast, in the case before us, the police had available to them a *plethora* of evidence, beyond that of merely "inconsistent" statements to authorities, establishing beyond doubt that JR was unbelievable and untrustworthy: (1) he had made a false allegation of rape— an "obvious lie"—against Officer Cook at the same time he accused Anderer of abuse; (2) he had expressed a clear and unambiguous intent to sue and make money off of his arrest and to "have the arresting officers' jobs"; (3) he was supposed to be ingesting five or six prescription drugs each day—including three (Paxil, Seroquel, and Adderall) which treat mental and behavioral deficits (schizophrenia, generalized anxiety disorder, attention deficit disorder, etc.)— and he had not taken his medication that day; (4) he had a history of delinquency, was a "constant problem" on Officer Shoman's beat, and furthermore his mother was "not surprised" that he was arrested for burglary; and (5) there was not one noticeable sign of physical abuse on his body, much less evidence that would suggest he had been punched in the face or nose, *i.e.*, there were no marks, bruises, cuts, abrasions or lacerations on the boy's face or nose, except the two small cuts on the *inside* of his lip; which more likely were from sources other than an alleged punch from a 200 lb. male to the facial area.[12] I am convinced that the very nature of this evidence should have led "a reasonable officer to be suspicious." *Hebron*, 18 F.3d at 422-23. *The combination of these factors, when considered in their totality* should have severely undermined and/or destroyed the validity of JR's fabricated and malicious statements, as reflected in *the*

---

[12] The majority's characterization of JR as having "split lower and upper lips" is highly inaccurate. Opinion at \*9. Furthermore, it defies logic to suggest that a reasonable person would conclude that JR had been punched in the face when, although there were minor cuts on the *inside* of the juvenile's mouth, there were no corresponding cuts, contusions, lacerations, swelling or any other sign of impact on the *outside* of JR's face, nose or mouth.

*district court's finding* that JR's previous "fanciful allegations against [Officer Cook]" raised "*serious issues concerning JR's credibility*." *Anderer v. Jones*, No. 01-C-0668, at *7 (E.D. Wis., Sept. 30, 2002) (emphasis added).

While I am well aware, and agree, that the law does not require investigating officers to "exclude *every* suggestion that a victim is not telling the truth" prior to making an arrest, *Spiegel*, 196 F.3d at 724 (emphasis added), the facts and circumstances of this case *most certainly* would have "le[d] a reasonable officer to be suspicious" and most cautious of his claims. *Beauchamp*, 320 F.3d at 743. Under these conditions, where investigating officers knew that the position of an officer who had been employed by the Department (3 ½ years service on the force) was in jeopardy, and that the claimant was an incorrigible, malcontent, out-of-control psychotic juvenile, JR (12 years of age), who made what may best be characterized as flippant and offhand accusatory statements[13] that he had been hit by Anderer and raped by Cook; can the majority really argue on legal grounds that the investigators did not have a duty to do more investigating into the juvenile and his statement? I think not. I am therefore at a loss to understand the majority's conclusion that JR was a reasonably credible witness and that no further investigation into his allegation was necessary, which is in sharp contrast with the credibility findings of the trial judge, as well as my personal appraisal. *See* Opinion at *8-10 (citing the "reasonably credible wit-

---

[13] Officer Logan testified that just before JR made his allegation, i.e., pointing at Anderer and stating "that officer hit me," JR and the other juveniles were seated at a table in the garage and while Logan "was watching the juveniles at the table, they were all laughing (including JR) about their situation. Therefore, despite the implication by the majority that JR made his claims against Anderer in a sober and reflective manner, JR was actually just continuing his laughing, joking, boisterous and out-of-control behavior when he implicated Anderer.

ness" standard, and refuting "Anderer['s] claim[ ] that JR was not a credible victim . . . .").

## C. Lack of Evidence Corroborating JR's Claims of Abuse

As clearly portrayed in the photographs taken immediately after the alleged assault as well as the reliable affidavit testimony of officers that examined JR (Officers Logan and I.D. Techs Brown and Kathrein), there wasn't one scratch or bruise nor any type of abrasion, contusion or blemish on the outside of JR's face, nose or mouth. In spite of this, the majority attempts to lend credence to the trial judge's speculatory statement (*i.e.*, that "J.R.'s statement that Anderer hit him was consistent with the blood on J.R.'s face and shirt"). In doing this the majority evidently relies on JR's bloody nose and dirty and worn shirt, as well as two cuts on the inside of his mouth and upper lip, *see* Opinion at *10, to somehow validate JR's (otherwise unbelievable) story and relieve the police from performing a reasonable investigation into the validity of his delusionary claim of abuse. In so doing, the majority completely casts aside any and all exonerating testimony from the citizen witness (Mitchell) and *six police officers* (two of whom clearly stated they did not see any physical confrontation between Anderer and JR, and four of whom stated no such confrontation took place). *See* Opinion at *12. The majority also somehow sees fit to ignore the sworn affidavit testimony and exhibits (photographic renditions of JR), *see* Opinion at *12-13, submitted by the trained and knowledgeable I.D. Technicians, David Brown and Kara Kathrein, who concluded that JR's lip cuts were most likely due to "a pre-existing condition" and that *they did not appear to be "caused by a punch . . .,"* Brown Aff. ¶ 5, 6; *see also* Kathrein Aff. ¶15, and which instead could more likely have been caused by JR biting his inner lip or as a result of a dried out mouth condition and a canker sore. Indeed, Brown claimed—and we must accept as true his statement—that "th[e] injury was so minor that it was not worth taking a picture of except for the purpose

of being able [to] identify in the future the exact extent of the alleged injury [JR]" referred to. Brown Aff. ¶ at 6. As Kathrein maintained, the "*small cut appeared [to be a] bit[e] [to the inner] lip or . . . a canker sore," rather than an injury caused by a "punch to his face.*" Kathrein Aff. ¶¶ 15, 16 (emphasis added).

The majority attempts to cast to the winds and dismiss the photographs and affidavit testimony submitted by the I.D. Techs' out of hand, on the purported basis that "one ID tech did not photograph JR until *after* Anderer had already been arrested, and so would have had nothing to contribute to the probable cause determination prior to his arrest." Opinion at *13. This statement is also inaccurate, for the fact remains that I.D. Technician David Brown *did take* the photographs of JR well *prior to Anderer's arrest*—photographs taken at 10:15 p.m.—*a full two and a half hours before Anderer's 12:35 a.m. arrest*. The majority also criticizes the time frame during which these photographs were developed by stating that the "photographs [of JR] . . . were not developed until *after* Anderer's arrest." Opinion at *11. The question naturally arises: are photographs usually taken and DEVELOPED at the very scene of a crime of this nature? I think not (at least not before the advent of digital cameras which, at the time, were not carried by police officers).

Furthermore, although the photographs were not developed until post-arrest, the majority's argument that they are thus irrelevant is a red herring.[14] *See* Opinion at *13. These

_____

[14] I take issue with the majority's description of the statements made and photographs taken by the I.D. Techs as "irrelevant facts which have no bearing on what the officers reasonably knew when they arrested Anderer." Opinion at *11, n.9. Although I agree that at the time of arrest these facts may have been irrelevant on their own, they do demonstrate that the IAD's assessment of the evidence in this case was unreasonable and that further investiga-
(continued...)

photographs *are relevant* to the probable cause inquiry because the developed negatives support the determination of ID Technician David Brown that *the cut on JR's inner lip was the result of a "pre-existing condition" such as a "dr[ied-up] lip" or "canker sore" and thus did* **not** *appear to be "caused by a punch."* Brown Aff. ¶¶ 5, 6; Kathrein Aff. ¶16. Furthermore, the majority fails to recognize that David Brown's determination that JR's "injuries" were *not consistent* with abuse *was made* **well before Anderer's arrest** (at 10 p.m., two hours prior to Anderer's arrest). Thus, both the pictures of JR's lips before and after the arrest, and the testimony of the I.D. Technicians who took them, support the conclusion that *JR's injuries* **were not** *consistent with a punch to the face from a 200-lb. man and, thus,* **casts grave doubt on** *Chief Jones's and his command officers' decision to place Anderer under arrest for abuse* and Officer Hoerig's less than forthright statement that the cuts on JR's lips were either "serious" in nature or consistent with abuse. *See* Hoerig Aff. ¶ 16.

Additionally, *contrary to the majority's contention, although the other I.D. Technician, Kara Kathrein, took pictures of JR approximately an hour after Anderer's arrest, her stated observation that JR's lip cut "was not consistent*

---

[14] (...continued)
tion was warranted because JR's alleged "injuries" were not serious enough to make his allegations of being hit by a 200-lb. police officer reasonable. *See supra* pp. 47-55. In addition, when viewed in the light of all of the other factors which made JR an unreliable witness (such as: (a) his out-out-of-control behavior; (b) his failure to take his medication; (c) his propensity to make up allegations about other officers, *i.e.*, stating that Cook "raped him"; and (d) the lack of one bruise, scratch, abrasion or laceration on his face or nose) the ID Tech's pictures and statements give us a clear picture of what the situation was that night, and the shocking lack of good-faith and judgment the IAD used when the proceeded to arrest Anderer on these utterly baseless and unreasonable charges. *See infra* pp. 43-44, 52-54, 81-85.

*with being struck in the face by an adult male,*" Kathrein Aff. ¶ 16 (emphasis added), *is certainly relevant to the reasonableness of the probable cause determination, since Kathrein's observations of JR were very proximate in time to Anderer's arrest.* See Opinion at *13. Again, the majority appears to misconstrue Anderer's argument regarding the importance of the I.D. technicians' observations that the "injuries" referred to were inconsistent with a punch. The *majority* states in its opinion that I.D. Technician Brown's and Kathrein's accounts of JR's injuries on the night of his arrest are irrelevant because police officers "themselves regularly investigate batteries against persons and are capable of assessing the nature and possible cause of injuries" and, thus, there was no reason "these ID techs should have been consulted by the officers investigating JR's claims prior to arresting Anderer." Opinion at *12-13. Might I make clear that I am not arguing that the investigating officers were under any duty, much less an obligation, to ask the I.D. Technicians for their opinions before reaching their determination that the injuries were or were not caused by Anderer. Instead, Anderer argues (and I agree) that the observations of these QUALIFIED EXPERTS who personally observed, witnessed and photographed JR's alleged lip lacerations after he arrived at the station—and, more specifically, their *opinion* that the condition of JR's lip injuries were *inconsistent* with the allegations of abuse—*are relevant in determining whether Lt. Hoerig's assessment of the juvenile's injuries to the contrary was reasonable or credible. It was not.* Just as there is no requirement that investigators consult with I.D. Technicians about the possible cause of injuries to an alleged victim, neither is there any requirement that an individual get a second opinion when diagnosed with a malignant brain cancer which requires surgery; however, such an opinion is often helpful and instructive and could very well inform the initial examining doctor of something he or she may have overlooked. After all, two minds, especially those specifically trained and possessing a great amount of experi-

ence, are frequently considered more convincing and helpful than one.

It was illogical and indicative of incredibly poor judgment for Hoerig and the IAD investigators to cite JR's "injuries"—including his inner lip cuts—as evidence supporting their decision that there was probable cause to arrest Anderer for abuse of a child without a scintilla of evidence as to any bruise, abrasion, blemish, contusion or laceration to JR's outer facial area consistent with the juvenile's flippant and offhand accusation that he was punched in the face and mouth by a 200-lb. man while entering the squad car. There is no evidence in the record that JR's inner lip cut had changed in appearance (improving or worsening) in the short space of time between Hoerig's examination of JR (approximately 9:15 pm), Brown taking his photographs (10:15 pm), Anderer's being arrested (12:30 am) and the time at which Kathrein took her photographs (1:30 am).[15] Thus, as I have pointed out earlier, viewing the facts in a light favorable to Anderer, as we must at this stage of the proceedings, veteran officer Kathrein's observations that JR's inner lip cuts resembled "pre-existing" canker sores or a "bitten lip" causing bleeding were, contrary to the majority's contention, _highly relevant_ to the probable cause inquiry. *See* Opinion at *13. This _evidence casts serious doubt on Lt. Hoerig's most questionable and unfathomable determination that "JR['s] [lip] injuries [were] consistent with being hit in the mouth_," Hoerig Aff. ¶ 16 (emphasis added), and thus

---

[15] Because there is no evidence that the injury changed in appearance between the time when Lt. Hoerig examined JR and when Kathrein took her photographs, Kathrein's opinion that the cut was "very minor," there was "no bruising on his face . . . [h]e did not have a swollen or fat lip," "he had no visible signs of injury," and thus his condition was "not consistent" with a punch (formed at the time she took the photographs) should be considered as evidence that the alleged wound was *not* consistent with JR's allegation of abuse. Kathrein Aff. ¶16; *see* Hoerig Aff. ¶ 16.

also serve to undermine Hoerig's careless and unsupported judgment that there existed probable cause to arrest Anderer.[16] Did this constitute a good-faith probable cause inquiry? The answer is NO. Thus, I reiterate that the statements of the I.D. Technicians, which are contrary to those of Hoerig and the IAD investigators, were _highly relevant_ when considering the question of whether there was probable cause.

It is obvious that Anderer's arrest, which the district court and the majority have seen fit to uphold as supported by probable cause, was at least in part predicated on Lt. Hoerig's recommendation to Chief Jones that probable cause existed. _See_ Opinion at *8-9. This is in spite of the fact that no living person interviewed either before or after the Anderer's arrest could corroborate JR's claims of abuse. For example, Officers Michael Jones and Jeffrey Logan testified that they had no idea what caused the alleged in-

---

[16] Over and above Brown's and Kathrein's testimony regarding JR's injury, the photographs themselves (true and accurate representations of the condition of the juvenile's facial area after reaching the police station) reflect only a minor laceration on the inside of JR's bottom lip and a slight blemish inside the upper lip—the type of blemishes that would be consistent with and which would be more likely attributable to any number of other factors, such as JR biting his lip or canker sores caused by a dry-mouth condition associated with, and intensified by, the combination of the myriad of medications JR had been ingesting. _See_ David Dunplay, et al., PHYSICAN'S DESK REFERENCE 1587 (58th ed. 2004) (giving the incidence of dry mouth associated with Paxil, just one of the medications JR was taking, as about 18% in clinical trials). Importantly, the photographic evidence as well as the ID Tech's testimony, establishes the fact that there was _no swelling, bruising, redness, trauma or abrasions of any kind_ anywhere on the juvenile's facial area, which one would observe on a child who has been hit by a 200-lb. man. _See_ Brown Aff., Exh. 1000; _see also_ Kathrein Aff., Exh. 1006.

jury to JR. In addition, as outlined above, I.D. Techs Brown and Kathrein testified as to the lack of any bruise, blemish, abrasion or laceration on JR's face or nose and to the fact that JR's "injuries" were not consistent with being punched in the mouth or nose by a 200 lb. man. Also, as set forth *infra*, Officers Shoman, Centeno, Cook, and Bohlen, as well as the lay witness, Mitchell, testified that they did not witness any altercation whatsoever between Anderer and JR, contrary to JR's allegations. In conjunction with the testimonial evidence, the pictures taken both before and after Anderer's arrest do not corroborate JR's story. Rather, these photographs and statements establish that there were no cuts, bruises, abrasions, lacerations, contusions or other signs of trauma to JR's face which might tend to give some credence to his claim that Anderer had punched him. Thus, when all the facts and circumstances in the record are viewed in the light most favorable to Anderer as the law requires us to do at this stage of the proceedings, I remain convinced that probable cause was not established and, furthermore, that it was unreasonable for Lt. Hoerig to deduce, for the district court to speculate, and for the majority to similarly conclude, that Anderer "had committed . . . an offense." *Spiegel*, 196 F.3d at 723 (quoting *Qian v. Kautz*, 168 F.3d 949, 953 (7th Cir. 1999)).

D.  Anderer's Fifth Amendment and Contractual Rights

   More importantly, THE MPD'S PROBABLE CAUSE DE-TERMINATION, AS WELL AS THE DISTRICT COURT'S FINDING AND THE MAJORITY'S OPINION RATIFYING THAT DECISION, leave a great deal to be desired insofar as each one of them rely on Anderer's "TOTAL FAILURE TO PROVIDE ANY EXPLAINATION FOR THE INJURIES" AS A "CIRCUMSTANCE" SUPPORTING JR'S CLAIM OF ABUSE. Opinion at *10 (emphasis added). After all, Anderer    properly    invoked    his    lawful    contractual

right—which is protected by his employment contract with the MPD—not to give a statement without representation present while he was under investigation for a crime. In addition, like any other citizen of the United States, including law enforcement officers, Anderer had every right to refuse to make any statement that could be used against him in a criminal proceeding under the Fifth Amendment to the Constitution.

As to his contractual rights, the MPD Rules and Regulations set forth that:

> In investigations that require an immediate interview, the member will be allowed a reasonable opportunity to obtain the presence of and to *consult with a representative of his/her choice before and during the interview.* If a representative of the member is not readily available and if the supervisory officer determines that it is necessary to immediately continue the interview to complete the investigation, the supervisor shall consult with the Commanding Officer of the [IAD] prior to the continuation of such an investigation. If any member being interviewed by a supervisory officer requests representation, and that representation is denied, the supervisory officer shall prepare an In the Matter of Report indicating the circumstances which led up to the request for representation and the reason why the representation was denied.

MPD Rule 3/450.05(D)(8) (emphasis added). Additionally, I must note that, according to the MPD Rules and Regulations which were received into the record as evidence, an officer can be compelled to answer questions posed by an investigating supervisory officers only when, prior to the interview, the officer IS GRANTED IMMUNITY and advised that any answers to questions presented and responses made thereto "and the fruits thereof, cannot be used against [him]

in any criminal proceeding." *See* MPD Manual §3/450.05(D)(5); *see also Driebel*, 298 F.3d at 638 n.8. At no time was Anderer offered immunity and he was never compelled to give a statement, nor was he provided with a union representative as he demanded, because he was arrested shortly thereafter. However, IAD officers did attempt to coerce a statement from him in complete disregard for their own regulations. Detective Harrison "asked if [Officer Anderer] would give a statement," and Anderer told Harrison, "absolutely not, not without union representation." Anderer Aff. ¶¶ 71, 72. Also, Detective Harrison, who, as an acting MPD command officer (and like every other MPD officer), is sworn to uphold the laws of the State of Wisconsin and the ordinances of the City of Milwaukee, then proceeded to blatantly threaten Anderer when stating that she was "going to get a sergeant [t]here to [do a] PI-21." *Id.* at ¶¶ 73, 74. This meant she was going to get a sergeant to compel and force Anderer to give a statement under threat of demotion, disciplinary action or even discharge. *See* MPD Rule 3/450.05 et seq. What was not stated to Anderer was that any statement that might have been given as the result of a PI-21 could not be used against him in any criminal proceeding. As it turned out, Harrison and the IAD investigators had no intention of ever "PI-21ing" Anderer because their goal throughout this pre-ordained and result-orientated process was to arrest him, therefore, the speedy arrest process continued while Anderer remained silent.

It is interesting to note that, at this time, before his arrest and after her threat to compel him to speak, Anderer did speak to Detective Harrison "off of the record . . . ." Anderer Aff. ¶ 75. Anderer asked Harrison what he was going to be charged with and, according to Anderer she responded: "That's what doesn't make any sense. He's accusing you of *PUNCHING HIM WITH THE BACK OF YOUR HAND AND THE KID HAS NO INJURIES OTHER THAN A SMALL CUT ON THE INSIDE OF HIS LIP, WHICH YOU CAN BARELY SEE, AND*

*WHICH IS NOT CONSISTENT WITH A PUNCH*." *Id.* at ¶ 76 (emphasis added). Anderer then gave the eyewitness James Mitchell's address and phone number to Harrison and watched as she transcribed this information in her notebook, trusting that he (Mitchell) might be contacted to corroborate Anderer's lack of involvement in the alleged incident. *Id.* at ¶77-78. Anderer also asked Harrison if Officer Cook was going to be charged with rape, and Harrison replied that Cook was not going to be charged and that he (Anderer) was the sole target of the investigation. *Id.* at ¶79. Anderer responded by saying "that's bullshit, I'm 200 pounds, if I would have punched that kid, I would have left some brusing or swelling on his face, and would have cuts or redness on my hands . . . ." *Id.* at ¶ 80. Anderer then requested that JR be taken to be "medically cleared" (or examined by a medical professional). *Id.* In addition, Anderer displayed his hands to the detectives, which Harrison examined, and at that time he (Anderer) requested that his hands be photographed. *Id.* at ¶80-81. Harrison told Anderer that the I.D. Technician had left, but she later reassured him that "WE KNOW [ALL OF] THESE COMPLAINTS ARE BULLSHIT . . . WE ARE GETTING TIRED OF INVESTIGATING FALSE ACCUSATIONS."[17] *Id.* at ¶ 81-82 (em-phasis added). A few minutes later, Anderer once again requested that photographs be taken of his hands. *Id.* at ¶ 94. Instead, Harrison's superior, IAD Detective Mercedes Cowan, exam-

---

[17] In a curious and unexplained about-face Detective Harrison subsequently changed her story and, now playing in tune with the Jones orchestra, told Lt. Hoerig that she believed JR's story and that, in her opinion, there was probable cause to arrest Anderer. Harrison Aff. ¶ 21. Whether Harrison was playing good-cop/bad-cop or she was pressured by Hoerig and officers above her to go along with her (Hoerig's) verison of events is unknown. *However, assuming Harrison's statements to Anderer were truthful (i.e., that she thought JRs complaint was false) she did not believe there was probable cause to arrest Anderer.*

<u>ined Anderer's hands with a high-powered flashlight and stated "you don't need a photo tech."</u> *Id.* at ¶ 98. Photographs never were taken of Anderer's hands nor was the pristine and unblemished condition of his hands ever noted in the record, and, as noted above, the MPD "fast-track" arrest process resulted in Anderer being arrested shortly thereafter. Was this blatant declination of his request for photographs of his hands an example of good-faith and fairness? I think not.

Furthermore, in their haste to arrest, confine and humiliate Anderer, the MPD went so far as to <u><small>ATTEMPT TO HAVE ANDERER BOOKED AND JAILED IN HIS POLICE UNIFORM</small></u>, apparently in an effort to further demean him. However, the Milwaukee County Sheriff's Department officers, in an exercise of good judgment, refused to admit and accept Anderer into the Criminal Justice Facility (county jail) dressed in his police uniform, and sheriff's officers directed that he change into his street clothes. Thus, following the IAD's rush to judgment, Anderer was seized and arrested *and, to add insult to injury, was very close to being subjected to further ridicule, and possible physical harm, by almost being jailed in his police uniform (there being little affection between prisoners and law enforcement personnel)*.

As mentioned above, under his employment contract with the City of Milwaukee Police Department (specifically, MPD Rule 3/450.05(D)(7)), Anderer was entitled to "have a representative of [his] choice present" during questioning; thus he was fully justified in relying on his *<small>CONTRACTUAL RIGHT TO REFUSE TO ANSWER QUESTIONS, SPECULATE OR ATTEMPT TO PROVIDE ANY TYPE OF EXPLANATION AS TO WHEN, WHY AND HOW</small> JR <small>SUFFERED THE NOSEBLEED</small>*. The fact that "Anderer made no comment or report concerning how JR [might have been] injured," Jones's Br. at 20, could not and *should not* have been held against him. *Also, by no stretch of the imagination, could Anderer's refusal to speculate as to the cause of JR's alleged injuries be considered a factor in establishing probable cause to arrest him for abuse (pursu-*

*ant to his Fifth Amendment right not to incriminate himself)*. Nevertheless, the district court, without a scintilla of precedential support, exhibited faulty reasoning and SPECULATED THAT ANDERER'S LACK OF "EXPLA[NATION FOR] THE CAUSE OF JR'S BLOODY NOSE" could be considered a "factor[ ] sufficient to supplement any lack of credibility in JR's statement[s]." *See Anderer v. Jones*, No. 01-C-0668, at *11 (E.D. Wis., Sept. 30, 2002) (emphasis added). Even more unfortunate is that my colleagues in the majority readily adopted this unsound rationale, without any support in the law, holding and stating that:

> Given these circumstances—a 12-year-old's injuries and bloody appearance, his consistency in reporting how he had been injured, and *Anderer's total failure to provide any explanation for the injuries* when no other officer observed JR in that condition prior to turning him over to Anderer's sole custody—*we believe that Milwaukee police officers had probable cause* to believe that Anderer had intentionally or recklessly caused JR's bodily injury.

Opinion at *10 (emphasis added). The majority's mysterious use of Anderer's refusal to give a statement as a premise on which to base their determination of probable cause, is unsupported with any case law and rests on a foundation of quicksand.

   The district court's, as well as the majority's, willingness to rely on Anderer's refusal to give a statement as an essential prong of the "evidence" establishing probable cause to arrest him for a crime is particularly troubling when one considers and reflects upon *over 200 years and volumes of precedent in case law supporting Anderer's Fifth Amendment right protecting him against self-incrimination*. IT IS INDEED "WELL-SETTLED . . . [THAT] '[P]OLICEMEN . . . ARE NOT RELE-GATED TO A WATERED-DOWN VERSION OF CONSTITUTIONAL RIGHTS.'" *Driebel*, 298 F.3d at 637 (quoting *Garrity*, 385

U.S. at 500) (emphasis added). And the Fifth Amendment's self-incrimination protections, which prevent the "government [from] forc[ing] a person to make a statement, even out of court, that might be used as evidence that he had committed a crime," *Atwell v. Lisle Park Dist.*, 286 F.3d 987, 990 (7th Cir. 2002), are well-established. *Id.* Thus, I am at a loss to understand how <u>the MPD, the district court, and now the majority include Anderer's proper and justified exercise of his well-established Fifth Amendment right to refuse to give a statement which might incriminate him (in addition to his separate and distinct contractual right not to give a statement absent representation) as a factor in satisfying the probable cause standard</u>. After all, <u>a person "may not be detained even momentarily without reasonable, objective grounds for doing so; and his refusal . . . to answer does not, *without more*, furnish those grounds</u>," *Florida v. Royer*, 460 U.S. 491, 497-98 (1983) (emphasis added)—<u>*much less can a refusal to answer potentially incriminating questions ever be construed as constituting an element of the probable cause requirement to arrest*</u>.

Again, I am well aware that according to MPD Rules, and consistent with the law, a police officer who is under investigation in matter which may result in a criminal proceeding *may* be compelled to give a statement during an investigation—but <u>NOT UNTIL SUCH TIME AS HE HAS BEEN GRANTED IMMUNITY FROM CRIMINAL PROSECUTION IN THE MATTER UNDER INVESTIGATION</u>. *See Driebel*, 298 F.3d at 638 n.8; *accord Lefkowitz v. Cunningham*, 431 U.S. 801, 806 (1977). This was obviously not the case here (because Anderer was never compelled to give a statement), and so this exception has no bearing on Anderer. Nonetheless, considering Anderer's contractual employment right, as separate and distinct from his Fifth Amendment rights, the MPD's concerted effort to compel a statement absent representation (even by threat)—and then to make use of his lawful refusal to comply without the requested repre-

sentative present as a basis for probable cause—is clearly violative of his contractual employment rights, as well as his well-established constitutional rights to refuse to answer.

Indeed, in the context of a lawful *Terry* stop (an investigatory questioning supported by reasonable suspicion)—which may be the most analogous situation—*the question of whether an investigating officer may detain an individual for refusing to answer a potentially incriminating inquiry, or whether he may use such refusal to elevate his mere suspicion to the level of probable cause, is an issue neither the U.S. Supreme Court nor this Court has resolved to date*. *See, e.g.*, *Tom v. Voida*, 963 F.2d 952, 959 n.8 (7th Cir. 1992); *cf. Cf. Hiibel v. Sixth Judicial Dist. Court*, 124 S.Ct. 2451, 2460-61 (2004).

The majority *insists on using Anderer's "failure to provide an[ ] explanation for [JR's] injuries" as a factor supporting probable cause*. Opinion at *4, *10 (emphasis added). To the extent that the majority relies on Anderer's proper invocation of his contractual rights, as well as his inherent Fifth Amendment rights to refuse answer potentially incriminating questions when the suspect in a criminal investigation, to *"permit the [MPD] officer[s] to elevate [their] reasonable suspicion into probable cause*," *Tom v. Voida*, 963 F.2d at 959 (emphasis added), I disagree with this newly created theory of law which employs most novel reasoning. In their attempt to support their argument, the majority has seen fit to follow the ill-advised MPD and district court's errant finding, which includes his "refusal" to answer as a factor establishing probable cause, and has entered into an unchartered area of the law; essentially creating this new spurious theory of the law which runs contrary to Anderer's well-established rights. Why the MPD, district court and now the majority relied on this legal hand grenade, is most puzzling. Anderer properly invoked his contractual rights when he stated to Detective Harrison that *he would*

*absolutely not answer any questions without union represen-
tation present*. Given this fact, Anderer was acting well
within his protected *rights (both constitutional and contrac-
tual) when he refused to give a statement to the IAD investi-
gators*.[18] Thus, as a matter of logic, there was no reason for
anyone to assume Anderer *should* have known how the
bloody nose occurred, for there is no evidence in the record
that Anderer has ever undergone medical training (*e.g.*, any
type of training as a paramedic). Also, at the time JR's nose
began bleeding, Anderer was seated in the driver's seat
operating the police squad car while the juvenile was seated
and secured alone in the back seat of the vehicle during his
conveyance to the police station.

In the majority's brief and most limited response to my
analysis on this issue, they initially state, in a footnote,
that "the dissent contends that any reference to Anderer's
failure to explain JR's bloody appearance in the probable
cause analysis impinges on Anderer's Fifth Amendment and
contractual rights, *Anderer himself makes no such argument*
and, in fact, concedes his inability to explain JR's injuries."
*Id.* (emphasis added). I disagree with this unsupported free-
lance interpretation of Anderer's statements in the record.
The majority seems to infer that because Anderer, in their
opinion, did not make an argument regarding his contrac-
tual and Fifth Amendment rights, they are of no concern; I
disagree. *See* Opinion at *10, note 8. It should be noted
that, in his complaint Anderer alleges that he was deprived
of "rights secured to him by the Constitution and laws of
the United States and the State of Wisconsin." Anderer
Complaint at *1. Anderer specifically refers to violations of

---

[18] It should be noted that Officers Shoman and Cook also exercised
their contractual rights not to make a statement without an
attorney or union representative present when questioned about
the alleged incident involving Anderer and JR.

his Fourth and Fourteenth Amendment rights as well as violations of § 1983 in his complaint on more than one occasion and it is most clear that any probable cause determination, by its very nature, implicates the Fifth Amendment once an individual, as in this case, is determined to be a suspect in a criminal investigation and questions are posed to him in the course of that investigation. In addition, in his complaint Anderer (as well as the other officers) pled his contractual rights when stating that he told IAD investigators that "he wanted union representation before making any statement," and that he knew the IAD was "there to investigate criminal allegations." *Id.* at *8, ¶ 40, 43. Undoubtedly Anderer, as a three and a half year veteran of the MPD, was well aware of his constitutional rights, for he was required to inform suspects of them each and every time he made an arrest in the course of his duties. Once Anderer was the suspect of a criminal investigation, his Fifth Amendment, as well as his contractual rights, came into play; therefore, the "operative facts" giving rise to a violation were pleaded as part and parcel of Anderer's Fourth Amendment claim. *See Kyle v. Morton High Sch.*, 144 F.3d 448, 455 (7th Cir. 1998); *see also Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit*, 507 U.S. 163, 168 (1993).

However, even if we are to assume that in this case the issue was not pled or argued (as seems to be the majority's point of view), *THE LAW IS VERY CLEAR TAHT A CONSTITUTIONAL ISSUE MAY BE RAISED SUA SPONTE AT ANY TIME WHEN IT COMES TO THE ATTENTION OF THE PRESIDING JUDGE OR JUSTICE THAT AN INJUSTICE MIGHT RESULT BY NOT ADDRESSING THE ISSUE. Singleton v. Wulff*, 428 U.S. 106, 112 (1976). This is particularly true in a situation where, as here, *A GRAVE INJUSTIVE DID RESULT, i.e., OFFICER ANDERER BEING UNCONSTITUTIONALLY ARRESTED AND, AS A DIRECT RESULT, LOSING HIS TENURED*

*POSITION AS A POLICE OFFICER WHICH HE HAD HELD FOR 3.5 YEARS BASED ON THE FABRICATED TESTIMONY OF A PSYCHOTIC JUVENILE.* As the Supreme Court pointed out in *Singleton v. Wulff*:

> The matter of what questions may be taken up and resolved for the first time on appeal is one left primarily to the discretion of the courts of appeals, to be exercised on the facts of individual cases . . . Certainly there are circumstances in which a federal appellate court is justified in resolving an issue not passed on below, as where the proper resolution is beyond any doubt, or where injustice might otherwise result.

428 U.S. at 121 (internal quotations and citations omitted) (emphasis added); *see also, United States v. Heater*, 63 F.3d 311, 332 (4th Cir. 1995); *Cruz v. Melecio*, 204 F.3d 14, 22 n.7 (1st Cir. 2000); *Popovich v. Cuyahoga County Court of Common Pleas*, 276 F.3d 808 (6th Cir. 2002); *Davis v. Blackburn*, 803 F.2d 1371 (5th Cir. 1986). *But cf. Pearce v. E.F. Hutton Group, Inc.*, 828 F.2d 826 (D.C. Cir. 1987). Anderer's well reasoned claim, which is supported in the record, that the City lacked probable cause to arrest him under the Fourth Amendment is itself a constitutional question. It follows that the Anderer's Fifth Amendment rights are implicated because they are so inextricably intertwined with the issue of whether or not the City had probable cause to arrest him based, in part, on his silence. This case should be resolved by this Court in a way that does not offend the Federal Constitution or its long-standing principle, embodied in the Fifth Amendment, that suspects in criminal prosecutions cannot have their silence, refusal or failure to explain used against them in a court of law. *See, e.g., Griffin v. California*, 380 U.S. 609 (1965). I believe that I would be derelict in my ethical duty if I failed to address this (Fifth Amendment) issue in view of the fact that Anderer has suffered a grave

injustice including the loss of his tenured employment as a Milwaukee Police Officer (3.5 years on the job) based on what amounts to nothing more than fabricated testimony.

Next, the majority attempts to (in a self-serving interpretation of his words) highlight the fact that Anderer, in their opinion, "concedes his inability to explain JR's injuries," and that "Anderer made several voluntary comments to other officers, including that he did not know how JR received the bloody nose." Opinion at *10, n.8. I disagree with this statement as presented by the majority. As noted above, although Anderer did make voluntary comments, some of those qualified as "off-the-record" and the rest were made before he ever became a suspect. However, they all amounted to a "refusal" to even attempt to explain what caused JR's nosebleed. I fail to see how these additional references to the record (and to "off-the-record" statements by Anderer) have any relation to, or in any way undermine, Anderer's well-established constitutional right under the Fifth Amendment to refuse to give a statement or his refusal to even attempt to explain the facts (which was, *i.e.*, a refusal to answer) and circumstances of an event in which he was suspected of committing a crime. An "inference of guilt for failure to [explain the] facts peculiarly [or supposedly] within [Anderer's] knowledge," *Griffin v. California*, 380 U.S. 609, 614 (1965), is constitutionally impermissible when based on Anderer's refusal to explain or speculate how JR's nose started to bleed (indeed one wonders how Anderer, who is not a medical professional, and who was seated in the front seat of the vehicle driving the squad car with JR seated in the rear, could be expected to diagnose the cause of JR's alleged "nosebleed," which was in fact "mostly [mucus] mixed with some blood," *see* Logan Aff. ¶¶ 25-26, and not what would be expected to result if JR was, as he alleged, punched in the nose by a 200 lb. male). Frankly, the majority misses the point.

What the majority has failed to consider, reply to or support in any way with relevant case law or precedent is the fact that Anderer's rights under the Fifth Amendment entitle him to absolute protection from self-incrimination beginning at the very moment he became a suspect in a criminal prosecution. Anderer's statements to Sgt. Jones, which were informal, off-the-record and made prior to an investigation being launched, as well as his clearly articulated "off-the-record" comments to IAD. *See* Opinion at *4. In addition, Anderer's "on-the-record" refusals to answer any questions posed to him and right to remain silent continued to be protected throughout the course of the IAD's query into JR's preposterous allegations. *See United States v. Hale*, 422 U.S. 171, 180 (1975); *see also Driebel*, 298 F.3d at 637 ("IT IS INDEED "WELL-SETTLED . . . [THAT] '[P]OLICEMEN . . . ARE NOT RELEGATED TO A WATERED-DOWN VERSION OF CONSTITUTIONAL RIGHTS.' ").[19] Indeed, the IAD officers attempted to side-step and take an end-run around their own regulations by threatening Anderer in an attempt to coerce him (threats) into giving a statement, however, cognizant of his rights Anderer once again refused to fall into the trap and give a statement. I am convinced that it was constitutionally impermissible for the MPD (as well as the district court and now the majority) to base their probable cause determination on "Anderer's total failure to provide any explanation for [JR's] injuries." *See* Opinion at *10; *Griffin*, 380 U.S. at 614. Such an approach has never

---

[19] It is important to note that the comment Anderer made to Sgt. Jones immediately after JR was taken out of the car was made off-the-record and well before he was ever considered a suspect. In addition, statements made to IAD investigators regarding the charges were explicitly "off-the-record" when Anderer made them. In no way can these statements be considered as rising to the level of a waiver of Anderer's Fifth Amendment or contractual rights. *See* Opinion at *2, *4.

been endorsed by either the United States Supreme Court or this Court. *See, e.g., Tom v. Voida*, 963 F.2d at 959 n.8.

*It matters not in the slightest that Anderer related his refusal or inability to explain JR's alleged injuries to his fellow officers (either before becoming a suspect or after going "off the record"). It matters even less that Anderer constantly maintained this position long after the District Attorney and his immediate subordinate decided that there was no merit to the charges against him. Also, the fact that Anderer included a statement conceding his refusal to explain the cause of JR's alleged injuries in his pleadings before the district court (a fact that the majority now believes somehow affects his Fifth Amendment rights, see* Opinion at \*10 note 9*) is likewise irrelevant.* What is important, and what the majority chooses to overlook or even address in their opinion, is that at the time the MPD made the determination to arrest Anderer, its investigators were acting in violation of his Fifth Amendment protection against compelled incrimination. By using his "failure to explain JR's injuries," or his absolute refusal to make any formal statements as to the reason or alleged cause of JR's bleeding nose, against him the MPD was impermissibly acting in derogation of Anderer's constitutional rights. *See Griffin*, 380 U.S. at 614.

Furthermore, the majority's approach to this issue ignores the forest in search of a solitary tree by disregarding the exculpatory import of Anderer's statement. As the majority points out, Anderer maintained in off-the-record statements before his arrest, and maintains to this day, that to this day he does not know how JR's alleged fabricated injury occurred. Opinion at \*10 n.8. For, as this dissent illustrates: How was Anderer to know the source of JR's fabricated injury (which was likely no more than the result of a good sneeze)?

If anything, the majority's additional citations to the record only serve to underscore the fact that Anderer

throughout this period consistently denied any knowledge of the cause of JR's alleged injury and on numerous occasions voiced his ignorance of how and why JR suffered his "bloody nose." The majority cannot have it both ways, *i.e.*, Anderer's refusal to speak cannot be used against him while Anderer's "off the record" statements about his lack of knowledge as to how JR's nose started bleeding are also used to elevate reasonable suspicion to probable cause. Anderer's repeated refusal to answer and avowed ignorance of what caused the boy to start bleeding does nothing to increase the "probability or substantial chance" that Anderer was guilty of some wrongdoing such that there could possibly have risen to the crescendo of establishing probable cause to arrest him. *See Beauchamp*, 320 F.3d at 743. Indeed, Anderer's conceded and consistent refusal and truthful inability to explain what had occurred should have, if anything (and if the IAD had even had knowledge of these statements, as the majority seems to suggest) been viewed by a reasonable officer as evidence that Anderer was indeed telling the truth and not guilty of any wrongdoing. There is no proof in this record of any inconsistency in the "off-the-record" statements Anderer made to IAD investigators or pre-investigation statements he made to his coworkers. In the end, the majority suggests no justification whatsoever for the use of Anderer's constitutionally (and contractually) protected right to refuse to answer questions against him in the course of a criminal investigation. *See Stewart v. United States*, 366 U.S. 1, 7⎯8 (1961).

E.   Evidence Exculpating Anderer

The great weight of the evidence, including the sworn statements of six police officers (Officers Logan, Jones, Cook, Shoman, Bohlen, and Centeno) and one lay witness (Mitchell), establishes the fact that Anderer did not strike JR at any time, including the time frame when JR was

being secured in Anderer's squad car. However, the district court, in its order granting summary judgment for the defendants, journeyed into the wide and boundless abyss of speculation and conjecture and took it upon itself to state that ANDERER HAD AN OPPORTUNITY TO HIT JR SOMETIME AFTER JR WAS IN THE SQUAD CAR by citing "THE TIME IN WHICH JR WAS ALONE WITH ANDERER IN ANDERER'S SQUAD CAR," AS ONE OF THE CIRCUMSTANCES WHICH "WOULD HAVE GIVEN A PRUDENT OFFICER PROBABLY CAUSE TO ARREST ANDERER." *Anderer v. Jones*, No. 01-C-0668, at *8 (E.D. Wis., Sept. 30, 2002).

However, *the record clearly establishes* that Anderer radioed the station (according to police protocol) as he was leaving the Marina, and *arrived at the station "exactly **two minutes and two seconds later**."* Anderer Aff. ¶ 43 (emphasis added). Morever, Anderer testified via affidavit that "[a]t no time did I stop my squad car for anything other than traffic lights from the time I left the Pump House Marina until I arrived inside the District No. 2 garage, nor did I speak to JR during the transport, nor did I hit JR anytime, ever." Anderer Aff. at ¶ 44. Nonetheless, JR was once again deliberately lying and/or fantasizing when he told Detective Smith, after Anderer's arrest, that Anderer *had* stopped the squad car on the way to the police station and exited the vehicle in order to yell at him (JR). This scenario certainly enters into the realm of impossibility, considering Anderer could have just as easily yelled at the juvenile from the front seat (there was no need to stop the automobile) and ***the uncontroverted fact that Anderer did indeed arrive at the police station, with JR secured in the back seat of his squad car, 122 seconds after leaving the Marina***. I am at a loss to understand how anyone could have believed that the juvenile (JR) was truthful when telling Detective Smith that Anderer "stopped the car," got out of the driver's seat, "opened the [back]

door," and then proceeded to "t[ell] [JR] that he was going to 'whip his ass.'" With the time that it would have taken for Anderer to stop the squad car, turn off the ignition switch (per MPD procedure), remove the key from the ignition, unfasten his seat belt, open the driver's side door, exit the vehicle, close the front door, open the rear door, proceed to yell at the juvenile, close the rear door, open the front door, re-enter the vehicle, re-fasten his seatbelt, insert the key, start the engine, and continue to District No. 2, *there is no possible way all of this could have been accomplished within the 122 second recorded time frame*.

Furthermore, in contrast to the trial judge's unexplained, speculative thought process, JR *repeatedly specifically stated that Anderer hit him in the face **as he was entering the vehicle at the Marina and while being secured therein before the commencement of his conveyance to the station, not at any other time***.[20] Nonetheless the district court, in its journey into the wide and boundless abyss of speculation, inappropriately chose to rely on "the [amount] of time Anderer spent alone with JR" *on the way to the police headquarters* (only 122 seconds) as evidence corroborating JR's claim of abuse. *Anderer v. Jones*, No. 01-C-0668, at *11 (E.D. Wis. Sept. 30, 2002). Prior to Anderer's arrest, JR *never claimed to have been screamed at or slapped during the conveyance to the police station (while alone with Anderer)*, JR *only* stated that he was hit in the face and mouth *as he was being placed in the squad car, and **not** at any time thereafter*.

Also, as Anderer points out in his complaint, the MPD broke with ITS OWN PROTOCOL WHEN, DESPITE LT. HOERIG'S REPORT THAT JR WAS "SERIOUS[LY]" IN-

---

[20] By all relevant witness accounts (*e.g.*, citizen Mitchell and Officers Shoman, Bohlen and Centeno), Anderer placed JR in the squad car without incident.

JURED, *see* Hoerig Aff. Exh. 4, THE MPD FAILED TO TRANSPORT JR TO THE HOSPITAL TO HAVE HIM MEDICALLY CLEARED, AS REQUIRED TO DO UNDER BOTH STATE LAW AND MPD RULES AND REGULATIONS. *See* Wis. Stat. § 938.20(g)(4); *see also* MPD Manual § 3.090.95(H)(5)(b).[21] Nonetheless, had anyone medically trained been called to perform even a cursory examination of JR (considering Hoerig's description of JR as being "seriously" injured), such as a paramedic, jail nurse or physician, the MPD/IAD investigators not only would have discovered that JR's lip cuts were *inconsistent* with a punch (no bruising, swelling, contusions or abrasions) to his face, they also would have learned from a proper investigation, interrogation and cursory physical examination, that two weeks before this incident, *THE JUVENILE HAD ENGAGED IN INFLICTING SELF-MUTILATION UPON HIMSELF* (he had cut crosses into both of his arms). These crosses obviously were still visible on JR's person.

Had the MPD conducted an adequate physical investigation, and had JR been asked to explain how he obtained

---

[21] LT. HOERIG APPARENTLY INTENTIONALLY EXAGGERATED AND MAGNIFIED THE INCIDENT REPORT SHE COMPLETED BY STATING THAT JR WAS "SERIOUSLY" INJURED WITH "SEVERE CUT[S]/LAC[ERATIONS]." Hoerig Aff. Exh. 1001. However, even if one were to assume this is true, the report also states that JR "refused" treatment. *Id.* If JR was "serious[ly]" injured, the Lieutenant in charge of the investigation (Hoerig) violated MPD policy and procedure, and possibly state law, by failing to transport JR (an allegedly seriously injured person) to a hospital for treatment and obtain a medical release stating medial attention was refused. *See* § 938.20(g)(4); *see also* MPD Manual § 3.090.95(H)(5)(b) and (c). On the other hand, if JR was not "seriously" injured, as the uncontroverted evidence (sworn statements and photographs) set forth and accurately displayed in this dissent establishes, Det. Lt. Hoerig filed a falsified police report. Under either scenario this casts Lt. Hoerig's judgment as to probable cause in serious doubt.

these obvious scratches, marks and abrasions on his arms just below the shoulder, assuming he answered honestly, the investigators would have learned that they had been self-inflicted. As Dr. O'Grady stated in an assessment of the patient, dated April 10, 2001 *(it is interesting to note that Dr. O'Grady's assessment was performed almost contemporaneously to the to the incident in which JR falsely accused Anderer of assault, April 17, 2001),* JR *had recently experienced "PARANOIA AND AUDITORY HALLUCINATIONS [IN WHICH] VOICES WERE TELLING HIM TO HARM HIMSELF, OR TO HARM OTHERS."*[22] *See* O'Grady Report, Anderer Aff., Ex. 29 at 1 (emphasis added). JR's treating psychiatrist further opined that *JR suffered from depression, ADHD, and psychosis, and that HE WOULD CONTINUE TO POSE A "MODERATE" RISK FOR CONTINUED PSYCHIATRIC ILLNESS PROBLEMS "UNTIL HE C[OULD] BE STABILIZED FOR SOME LENGTH OF TIME ON [HIS] MEDICATIONS." Id.* at 3 (emphasis added).

Thus, given *JR's troubled psychiatric condition and behavioral disposition at this particular time (history of self-mutilation, "voices" he heard which "t[old] him TO HARM HIMSELF OR OTHERS," and repeated examples of run-ins with police),* JR was *fully capable* of contriving a story in relation to his alleged abuse and resulting alleged nose-bleed in order to cause the previously threatened trouble for his arresting officer so as to carry out his contrived psychotic intent to harm others and get Anderer and Cook

---

[22] As of June 13, 2001, according to JR's mother, JR was still undergoing treatment for "hearing voices," Hoerig Aff., Ex. 1001 at 48, a fact that is confirmed by reports from JR's physician at the time, Dr. Block. See Anderer Aff. Ex. B at 69 ("Hearing voices telling him to kill himself."). JR was prescribed Seroquel to help control his psychological condition and inhibit the "voices" he was hearing. *Id.* at 49.

fired.[23] Indeed, JR's nosebleed was most likely the result of a normal/hearty sneeze, rupturing a thin membrane or a blood vessel in his nasal passage, thus causing a nosebleed (which may have occurred on more than one occasion in the immediate days leading up to this incident) and thus produced nasal discharge consisting of "mostly [mucus] mixed with some blood," Logan Aff. ¶25.

In any case, what this brief glance into JR's medical condition makes clear is that *even a minimal medical investigation (consulting a medical health worker to perform a cursory physical examination) would have alerted investigators to a plethora of possible alternative medical and logical explainations for the bleeding exhibited by JR at the Precinct 2 Police Station, the extent to which he had been medicated, and would have also revealed serious psychiatric problems manifesting in self-mutilation, which most certainly would and should have contributed to raising serious doubts as to JR's credibility*. Instead, Chief Jones and his MPD command officers placed Anderer on the "express track" to arrest, and it appears that the four or five investigators involved found neither the time, THE ENERGY NOR THE INCLINATION TO COMPLY WITH THEIR OWN RULES AND REGULATIONS (WHICH REQUIRE THAT A PERSON COMPLAINING OF AN INJURY WHILE IN CUSTODY SUCH AS JR (LT. HOERIG STATED JR HAD SUSTAINED

---

[23] In addition, had the investigating officers even attempted to make an in depth inquiry into JR's medical record or obtain an explanation for his out-of-control behavior that night they would have discovered that two of JR's prescribed medications—Depakote and Paxil—are listed as having caused abnormal bleeding in users (the combination of which may have intensified the effect). *See* Depakote Side Effects, *available at* http:www.canadatrustrx.com/Depakote-information-Depakote-discount.htm; *see also*, Dunplay, et. al. PHYSICIAN'S DESK REFERENCE 1585-87 (58th ed. 2004). This also could help to explain the dried blood on JR's shirt, which most likely was the result of previous nosebleeds.

"SERIOUS INJURY") BE PHYSICALLY EXAMINED, *see supra* note 21, and accompanying text) PRIOR TO HAVING ANDERER ARRESTED.

As for the *lack of even one living, breathing person's testimony* corroborating JR's claim of abuse, reaching out the majority states that "Sgt. Jones and Officer Shoman could not corroborate JR's allegation against Anderer," but attempts to discount the import of such a fact by noting that "neither could [Jones or Shoman] refute it." *See* Opinion at *12. As to Shoman, this is an incorrect summary of the record, for as a reading of her affidavit reveals, Shoman *stated that she was positioned in her squad car slightly in front and to the right of Anderer's squad car and witnessed Anderer walk JR over to the squad car*. Although Shoman did not see Anderer place JR into the car she went on to state that: "[she] would have noticed a fight [between JR and Anderer] if one had occurred," but rather "*did not notice any commotion between Officer Anderer and [JR]*." *Id.* ¶¶ 21, 22 (emphasis added). However, Shoman went on to tell investigators that she had seen JR "in the back of Anderer's squad [car]" and that she had observed "no physical confrontation [or] injuries or blood on JR" at any time. Harrison Aff. ¶ 15. Both of these sworn statements by Officer Shoman also belie JR's claim that Anderer punched him immediately after securing him in the back seat of the squad car. *Thus, we must ask ourselves: why should anyone (Lt. Hoerig, Chief Jones, the district court judge, or the majority) give any credence to, much less believe, the incorrigible psychotic juvenile JR (without even a minimal investigation into his credibility) over this reliable witness Officer Shoman? Was Officer Shoman lying?*

The majority not only goes about mischaracterizing Shoman's exculpatory testimony (incorrectly stating that Shoman's testimony did not "refute" JR's allegation of abuse), *see* Opinion at *12, it also casts aside without explanation, in an unusual manner, the *additional exculpatory*

*testimony* from *four other police officer witnesses (Bohlen, Centeno, Logan, and Cook) and the citizen witness (Mitchell)* that, for whatever reason was not sought by MPD investigators in the time period prior to Anderer's arrest (Negligence? Bad faith? Orchestrated disregard of fair play and justice?—call it what you will).

As outlined above, James Mitchell, a citizen who was on the scene at the time of JR's arrest, according to his sworn affidavit, states that he "watched *every step of the way* while Officer Anderer [took] [JR] to his squad car," and that he continued to observe JR "as Officer Anderer guide[d] [him] into the back seat of the squad, [affixed JR's] seatbelt . . ., [and] close[d] the door [to the car]." Mitchell Aff. ¶ 14 (emphasis added). Mitchell, *whose observations were contemporaneous with the specific time period that JR claims he was hit or punched,* is *emphatic* that he (Mitchell) "*[a]t no time [saw] Officer Anderer strike [JR], or act in an[ ] abusive manner toward him,*" *id.* ¶ 15 (emphasis added), and that Anderer "*at all times . . . acted in a very professional manner*" toward the juvenile. *Id.* ¶ 16 (emphasis added). *Again, I must ask: is it rational to conclude that the witness Mitchell is lying about what happened and that the unruly, belligerent and out-of-control psychotic (less than law-abiding) juvenile is the only person telling the truth? Does the majority really believe Mitchell was lying?*

This is absurd; and given that the investigating officers were fully aware of the information Mitchell could provide, and were in possession of his address and phone number, and considering the incredibility of the fabricating juvenile, JR, (the claimant himself, and the *only* person who alleged abuse had taken place—rape and assault—with proof of neither), it was furthermore unreasonable for the MPD command officers and the IAD investigating officers to cut short their investigation before even attempting to obtain Mitchell's, or the other officers', accounts of the alleged situation when they well knew the most questionable and

troublesome character and behavioral traits of the juvenile they were dealing with.

Corroborating Mitchell's testimony, Officer Bohlen states in his affidavit that he "watched Anderer walk JR to his squad" and "*did not notice anything out of the ordinary when Officer Anderer placed JR in his squad.*" Bohlen Aff. ¶¶ 10, 12 (emphasis added). Bohlen also claims that he had "a *direct vantage point* to make these observations as *there w[ere] no obstructions in [his line of] view of Officer Anderer escorting and placing JR in his squad, and at no time was [he] more than 25 to 30 feet away from Officer Anderer and JR.*" *Id.* at ¶ 13 (emphasis added).

Officer Centeno (another exculpatory witness and officer at the scene of the alleged crime) also "saw Officer Anderer place the boisterous juvenile [JR] in[to] his squad," and remarked that "*[n]othing unusual happened*" between the officer and the suspect (JR). *Id.* ¶¶ 13, 14 (emphasis added). In fact, Centeno goes so far as to remark that "it *was not possible for Officer Anderer to have struck [JR]* as [he (Centeno)] was but one car length away from [Anderer's] squad and would have noticed [if] Officer Anderer [had assaulted JR]." *Id.* ¶ 23 (emphasis added). *Was Officer Centeno lying*?

In spite of the fact that Centeno's partner, Officer Bohlen, "spoke to a supervisor at [the Second Precinct Police Station] and told the supervisor that [he and Centeno] were at the [Marina] and . . . should be identified as individuals to be interviewed in any further investigation," neither officer was ever interviewed by investigators prior to Anderer's arrest. *Why? Orchestrated investigation possibly?*

Officer Logan, who was also on the scene of the arrest, corroborated the testimony of the other officers and noted that he "[did not] observe[ ] Anderer strike [JR]," Logan Aff. ¶ 47. Furthermore, Logan stated that as he had passed Anderer's squad car on the way out of the Marina, he had

"*observed [JR] seated in the backseat of the squad and [JR] did not appear to be injured in any way*." *Id.* ¶ 17 (emphasis added).

Finally, Officer Cook, who unlike the others, was asked to give a statement prior to the arrest, but stated, at the time, *that he "did not wish to make a[ ] statement[ ] WITHOUT [A] UNION REPRESENTATI[VE]" present—was eventually granted immunity from criminal prosecution and compelled to answer questions at 12:45 a.m., fifteen minutes AFTER Anderer's arrest and was therefore not used as part of the probable cause determination by Hoerig.*[24] Cook Aff. ¶¶ 41,

---

[24] The majority suggests that if "the statement given by officer Cook, had . . . been given prior to Anderer's arrest, [it] seems likely to have further supported the investigating officer's determination that probable cause existed to arrest Anderer. Opinion at *12 n.10. To support this the majority exaggerates Cook's statements to the extent that they cite him as having stated that after arriving at the station he "immediately noticed [JR] with blood running down both nostrils, his chin, blood on his shirt and both pant legs," and that he "was taken aback because the kid was in perfectly good shape before he went in to the squad, but not when he came out and thats [sic] not good." *Id.* However, this mischaracterizes Cook's testimony under oath. In Cook's affidavit he does state that he saw "blood dripping out of [JR's] nostrils straight down his chin," Cook Aff. ¶ 26, but nowhere does he state that he saw blood on the boy's shirt and pants. Also, Cook actually states that he was "shocked because when Officer Anderer took JR to his squad, JR was not bleeding," *Id.* at ¶ 27, however, the majority conveniently refuses to accept the fact Cook goes on to affirm that "[h]ad Anderer encountered any difficulty placing J.R. into his squad, I would have been in a position to have noticed any such commotion." *Id.* at ¶ 20. This by no stretch of the imagination can be classified as evidence which would "have further supported the . . . probable cause determination." Opinion at *12 n.10. Indeed, this is actually exculpatory evidence which (had the investigators bothered to gather it) would have severely damaged
(continued...)

45 (emphasis added). At that point, Cook stated he had "s[een] Officer Anderer speaking to JR" after JR had been placed "in the back of Anderer's squad." Cook Aff. ¶¶ 18-20. *Contrary to JR's continuance of his false and malicious allegations that Anderer had "yell[ed] at [him]" at this time*, Smith Rep. at 7, Cook stated that he "*never heard Officer Anderer scream at JR*," and furthermore that *Anderer had not "encountered any difficulty in placing JR into his squad*." Cook Aff. ¶¶ 18-20 (emphasis added). Cook emphasized that, *had* Anderer encountered "any difficulty" placing JR in the squad, Cook "would have been in a position to have noticed any such commotion." *Id.* ¶ 20.

---

[24] (...continued)

their unfathomed probable cause determination, despite the majority's intimation.

Furthermore, in the affidavit testimony given by Cook, he emphasized that the investigation conducted by the IAD was "unfair" and asserted that the "[IAD] had the power to get anyone they wanted for any purpose, and [that] this [situation] was reminiscent of Berlin in 1939." Cook Aff. at ¶ 71. Cook also chastized the IAD officers by producing his rules notebook and went on to state that "[t]hese rules you hold so precious, go out the window when you want to 'get' someone" as he threw the notebook over his shoulder. *Id.* at ¶ 72. It should be reiterated that Cook believed he was going to be a target of JR's outrageous and ridiculous accusations as well. *See supra* pp. 1-8, 11, 27, 32-37, 48, 69. Therefore, even after the incident, Cook feared that he would be subjected to the same unfair procedure that had befell Anderer, indeed Cook told A.D.A. Jon Reddin that he "was afraid the [IAD] of the MPD would trade up if they could not get Anderer by getting [him] for raping J.R. instead." Cook Aff. at ¶ 61. Therefore, despite the twist that the majority puts on out-of-context selective pieces of Cook's testimony, he would not have been beneficial to the IAD in their search for probable cause. In reality, Cook was not compelled to testify until after Anderer's arrest because he would have damaged the IAD's fabricated and terribly weak probable cause case against Anderer.

Obviously Chief Jones chose not to believe even one of his four officers (nor the citizen witness Mitchell) who all affirmatively stated that Anderer did _not_ abuse the juvenile. Nonetheless, Chief Jones, after being consistently rebuffed in his attempts to prosecute Anderer, he ultimately used internal procedures to terminate Anderer from the Department, after his 3 1/2-year tenure, for internal abuse charges in spite of the mountain of exculpatory evidence in the record and the Deputy District Attorney Jon Reddin and D.A. E. Michael McCann's finding that no charges could be substantiated. _Was Officer Cook (along with Officers Bohlen, Logan, Centeno, Shoman and witness Mitchell) also lying_? Moreover, if not by design, _why did the MPD command officers and the IAD investigating officers wait to compel Cook's statement until fifteen minutes after Anderer's arrest? Why wasn't this done hours, half an hour or even fifteen minutes earlier? Didn't they want his damaging exculpating testimony in the record on the probable cause issue?_

It is interesting to note that the IAD investigators also determined (probably with malice or forethought) not to interview these five exculpatory witnesses (Bohlen, Logan, Centeno, Cook, Mitchell), and because of this it was unreasonable for them to proceed with the arrest of Anderer. As Deputy District Attorney Jon Reddin stated in his memorandum, once these people _were_ interviewed (Shoman, Cook, Mitchell, as well as Officers Logan and Anderer were ultimately interviewed by Reddin himself), the only logical conclusion was that _no criminal charges could be sustained._ _See_ Reddin Memo., Jones Aff. Ex. 1002 at 1 ("_I have interviewed [JR], Anderer, officers Janice Shoman, Jeff Cook and Jeff Logan, and civilian James Mitchell [and]_ **_[b]ased on those interviews_** _I have concluded that we cannot prove how and by whom [JR's] injuries were incurred, and consequently [I conclude that] no criminal charges can be sustained._") (emphasis added).

F.  Lack of Good-faith in Investigation and Termination of Officer Anderer

I must reiterate that my purpose in reciting, in minute detail, the vast amounts of exculpatory testimony and evidence (which the investigators purposely failed to gather before arresting Anderer) in the respective time frames is *not* to play Monday morning quarterback nor to nitpick the record for minor (although these are far from minor) deficiencies in their investigation. Instead, it is my intention to convince my fellow colleagues that Anderer, who did not receive the protection he is entitled to as a U.S. citizen under the Fourth and Fifth Amendment as well as under his employment contract with the MPD, be given his day in court. I also wish to point out that the conduct of the officers who took part in this investigation leaves much to be desired and can best be described as surprising.

I am well aware that the law does not ordinarily "require that a police officer conduct an incredibly detailed investigation at the probable cause stage." *Spiegel*, 196 F.3d at 724-25. Nor does it "require law enforcement officers to . . . conclusively resolve[ ] each and every inconsistency or contradiction in a victim's account" prior to arrest, *id.* at 725, for, as this Court has made clear on prior occasions, "once [the officers] perform[ ] a *good-faith investigation* and assemble[ ] sufficient information from the totality of the circumstances to establish probable cause, they are not required . . . to continue searching for additional evidence." *Driebel*, 298 F.3d at 643-44 (emphasis added).

Under these circumstances, I am confident that the activity on the part of the command officers of the MPD and the IAD is not worthy of being classified as a proper investigation—much less a *good-faith[25] investigation*—but should

---

[25] Black's Law Dictionary defines good-faith, in pertinent part as: "A state of mind consisting of (1) honesty in belief or purpose, [or]

(continued...)

be more precisely characterized as an orchestrated inquiry in which the investigators merely went through the motions. The investigation amounted to, at best, no more than a sham inquiry (failure to follow police protocol) and produced what may have been (in the worst-case scenario) a pre-ordained result. The unreasonableness of this so-called "investigation" raises a *dark cloud of suspicion* over each and every one of the superior officers of the MPD and members of the IAD who participated in this detail. These officers failed to follow appropriate police procedures and selectively failed to interrogate in a timely fashion *at least four* police witnesses and the lay witness Mitchell who were unfavorable to the command officer's decision to arrest Anderer. Furthermore, the only "evidence" the investigators gathered in their "investigation" was a smattering of selected information which, when considered in its entirety, failed to establish probable cause.[26] The evidence was thus

---

[25] (...continued)
(2) faithfulness to one's duty or obligation . . ." BLACK'S LAW DICTIONARY 701 (7th ed. 1999). In addition, in *Driebel*, we characterized a good-faith investigation in the context of probable cause as one where investigators "assemble[ ] sufficient information from the totality of the circumstances to establish probable cause." *Driebel*, 298 F.3d at 644. Under either formulation, the officers investigating JR's allegations against Anderer fell far short of "good-faith."

[26] As discussed above, the universe of information relied upon by investigators was: (1) a baseless claim of abuse launched by an obviously lying juvenile witness suffering from auditory hallucinations urging him to do harm to himself and others (Cook, Logan and Anderer) and who was thus *not* "reasonably credible" (even the district court found and admitted JR's "statement alone [wa]s an insufficient basis for probable cause"), and (2) a bloody nose and cut inner lip which, under the circumstances (namely, JR's
(continued...)

"objectively [in]sufficient to warrant a prudent person in believing that [Anderer had] committ[ed] [the abuse]." *Mounts*, 248 F.3d at 714. *This is most tragic considering the oath that the investigating officers took to uphold the law and faithfully discharge the duties of the office to which they were appointed, for they failed to carry out their sworn duty in a fair, unbiased and impartial manner*.

Considering the lack of reliable evidence of Anderer's guilt, I, unlike the majority, *am convinced it was unreasonable for the investigatory detail to cast aside (and refuse to incorporate) the overwhelming amount of available known exculpatory testimony from officers (Centeno, Logan, Bohlen, and Cook) and a civilian witness (Mitchell) at the scene.* It was entirely unreasonable for the investigators to rely on selected tainted "evidence" of the alleged abuse that *fell far short of being* "reasonably trustworthy" or, for that matter, "sufficient to warrant a prudent man in believing that [Anderer] had committed [a battery]." *Beck v. Ohio*, 379 U.S. 89, 91 (1964); *Mounts*, 248 F.3d at 715.

Of course, the MPD command's unrelenting insistence in clumsily attempting to validate JR's allegation against Anderer—despite the lack of evidence (direct and/or circumstantial) of his guilt—did not stop with his arrest. Chief Jones, in particular, would not be deterred, for he personally insisted on pursuing the charges against Anderer. Initially, Jones had Anderer arrested *without* first referring the matter to the District Attorney's office for an independent review and determination, which is the more proper and

---

[26] (...continued)
"pharmacopoeia" of medications and mental problems—self-abuse and "hallucinations telling him to harm himself or others") could have had a host of explanations *other* than physical abuse from Anderer.

desired procedure.[27] Also, after *four investigations* (two independent) turned up *insufficient evidence to pursue criminal (either felony or misdemeanor) child abuse charges against Anderer*, the IAD insisted on pursuing Anderer by converting the unsuccessful and clumsy criminal investigation into a last-ditch *internal* investigation to determine whether Anderer had possibly violated <u>ANY</u> MPD rule or regulation, probably due to Chief Jones's insatiable desire to have Anderer terminated.[28] Ultimately, after the possibility of criminal charges against Anderer had been eclipsed, and just 96 hours after Anderer filed a lawsuit against the department, the newly appointed IAD command officers had the temerity and audacity to bring a police rule violation charge against Anderer producing the dubious charge of abuse of a child, of which there is no proof. This rule violation charge is what, in the end, resulted in Anderer's termination from the police force (again, without any felony, misdemeanor, or even city ordinance violation ever being brought, much less substantiated).

The nature of the internal charge was also most questionable when considering the timing of the charge in relation to the other facts and circumstances. The termination charges were brought only after Anderer's case had laid dormant for approximately a month and were filed just 96 hours—or three days—after Anderer filed his lawsuit against Chief Jones, Charles Grisham, Lt. Hoerig, Detective Cowan, and the City of Milwaukee. The decision to bring these

---

[27] *See supra* note 7 and accompanying text.

[28] Furthermore, it is interesting that they brought the internal charges against Anderer without conducting any further investigation into JR's allegation of abuse. Thus, they charged Anderer internally, and had him discharged, on the same (now complete) record and for the same offense that had generated *multiple* refusals to prosecute the criminal case against him by the DA's Office (two independent determinations by the Deputy District Attorney and the District Attorney himself).

charges is inconsistent with the District Attorney's Office's clear and repeated affirmation of the decision that there was *insufficient* evidence to prosecute Anderer for abuse. *See* Jones Aff., Ex. 1002 at 1-2 ("I cannot say with any assurance what happened . . . . It is entirely conceivable . . . that [JR] inflicted the injuries to himself").[29]

### III. Conclusion

This case, being very fact-intensive, begins and ends with the utter lack of credibility of JR's complaint against Anderer alleging that the officer struck him in the face and/or nose with his fist as he (Anderer) was positioning and securing JR in the back seat of the squad car—*before* the two-minute-two-second drive to the police station began. And on that score, as the district judge properly in part concluded, "Anderer raises *serious issues* concerning JR's

---

[29] The majority's contention that the "the Deputy District Attorney's later decision not to pursue criminal charges" is an "irrelevant fact" is a red herring, Opinion at *11, n.9, because although the decision by Jon Reddin was made after Anderer had been arrested (contrary to the preferred course of action, *see supra* note 7), such a determination simply lends further credence to Anderer's argument that the probable cause determination by the IAD, district court and majority was unreasonable. Arthur Jones Aff., Exh. 1002 (Reddin concludes that what happened to JR "in the back of the car will probably never be known to anyone but JR and Anderer," and that the speculative nature of the accusations against Anderer were "not the stuff of criminal charges."). It also serves to further establish that another independent law enforcement official was of the opinion that JR was utterly and totally unreliable as a witness, because as Jon Reddin noted in his written decision not to prosecute: "It is entirely conceivable [that] given [JR's] agitation, mental problems and stated intentions to get money out of this incident, that he inflicted the injuries to himself." *Id.* Also, Reddin's decision helps establish that the IAD failed to conduct a reasonable good-faith investigation, for had one been performed, Anderer would not have been arrested because probable cause never existed.

credibility . . . ." *Anderer v. Jones*, No. 01-C-0668, at *7 (E.D. Wis. Sept. 30, 2002). To recap the pertinent parts of the record, the MPD and IAD command and investigating officers, including the Chief, were aware of (or, had they conducted a reasonable and unbiased investigation, *would* have at least been aware of) the following factors which should have served to put JR's credibility in serious doubt, if not destroy it completely:

(1) ***JR had a demonstrated behavioral problem*** (he exhibited *outrageous, out-of-control, profane and obscene language* at the scene of the arrest, and further Officer Shoman stated he was a "*constant problem*" in her patrol area);

(2) ***JR had threatened to sue his arresting officers for money and get them (Anderer, Cook, and Logan) fired***;

(3) ***JR had exhibited a propensity to lie*** (he had accused Officer Cook of *raping him*—which the trial court found to be an "*obvious lie*," *Anderer v. Jones*, No. 01-C-0668, at *7 (E.D. Wis. Sept. 30, 2002));

(4) ***JR was supposed to be heavily medicated (but had failed to ingest his prescriptions on the day of the arrest)*** (and *at least two* of JR's prescribed drugs, as the officers well knew, were *used to control his psychiatric and behavioral problems*);

(5) ***the medications JR had failed to ingest that day were vital to his mental and physical well-being*** (JR's mother had urged the officers to "releas[e] [her son] from custody as soon as possible" in order that he might ingest his drugs, Cook Aff. ¶ 34);

(6) ***not one individual, including those interviewed by police, ever corroborated JR's allegation, and at least five individuals—four police officers (Shoman, Cook, Bohlen, and Centeno) and one citizen witness (Mitchell)—affirmatively refuted JR's hallucinatory tale*** (although only Shoman was interviewed by police prior to the arrest);

(7) ***there is no record of any blood or other stain on Anderer's uniform, and, viewed under a high-powered flashlight, Anderer had no blood, abrasions, brusing, scratches, or swelling of tissue on his hands, much less any evidence of trauma***, *see* Smith Report at 9; Anderer Aff. ¶ 98;

(8) ***JR's minor inner lip cuts were not consistent with the juvenile's allegation that he was hit in the face by a 200-lb. adult male*** (the I.D. Technicians testified—and we must accept as true at this stage—that the "small [lip] cut appeared as though [JR] may have bitten his lip or had a canker sore," and thus "***was not consistent with [the juvenile's allegation that he was] struck in the face by [Anderer]***," Kathrein Aff. ¶ 16);

(9) although JR, in an offhanded and flippant manner claimed he was struck in the face by Anderer, and suffered a nosebleed as a result, ***there was not a scintilla of evidence of bruising, abrasions, swelling, or any other sign of trauma to JR's face, nose, mouth or lips which would correspond with being hit in the face with a hand or fist. Also, the cuts on the inside of JR's lips, as well as the nosebleed, in the absence of any mark, laceration, bruise or abrasion on the***

*outside of JR's face are NOT consistent with a blow to the face from a 200 lb. adult male police officer. It is more accurate to believe that the minor inner-lip injuries resulted from a self-inflicted bitten lip which perhaps resulted from JR's injestion of a myriad of medications which, in combination, caused his dried-out mouth condition (canker sores) and that the nosebleed was caused by a normal/ hearty sneeze which ruptured the thin nasal membrane or a small blood vessel (contributed to by abnormal bleeding caused by the medication he was ingesting) in the nasal passage*; and

(10) *JR had been diagnosed by a psychiatrist as suffering from auditory and visual hallucinations as well as with the propensity to "harm himself and others" and he had the opportunity to inflict harm upon himself (self mutilation on both arms) and others (i.e., falsely accusing Cook of rape and claiming he would sue both Cook and Anderer and have them fired; chewing or biting his lip)*

The majority somehow looks past all of the recorded exculpatory evidence which seems to make clear JR's obvious propensity to fantasize and lie while (in stark contrast to the trial judge's contrary finding that JR was *not* a reasonably credible witness) embracing JR's claim, that the 200-lb. Officer Anderer hit him in the face with his fist as he was being placed in the squad car, as being reasonably credible. *See* Opinion at *9-11 (finding in favor of JR's credibility). The majority concludes that because: (a) JR arrived at the police station with a bloody nose; (b) while sitting at a table with the other burglary suspects, all of whom were laughing and joking about their situation, JR made the off-hand comment that "[t]hat officer hit me," Cook Aff. at ¶ 30; and (C)

*ANDERER REFUSED TO GIVE A STATEMENT IN THE MATTER*; there was enough evidence to support Chief Jones's decision to arrest Anderer for abuse. *See* Opinion at *10.

**Furthermore, the majority improperly and without any legal authority, relies on Anderer's invocation of his contractual right to refuse a statement absent representation, and his resulting "failure" to give a statement, as support for their probable cause determination. Opinion at *10. Contrary to the reasoning employed by the MPD, the trial court, and now the majority; _no court of law has ever allowed or approved of using a suspect's exercise of his constitutional right to refuse to give a statement in a criminal investigation in which he is a suspect as a factor establishing probable cause._ In addition, Anderer was entitled to invoke his right to have a representative present during any questioning pursuant to his employment contract with the MPD; therefore, that request should not have been used or construed against him. Thus, there are _two_ insurmountable hurdles and roadblocks, one constitutional and the other contractual, to the majority, district court, and MPD's attempt to use Anderer's refusal to give a statement as a factor establishing probable cause for his arrest. Indeed, what the MPD, district court, and majority accomplished was to unacceptably twist Anderer's invocation of his contractual rights as well as his inherent constitutional rights and use them against him as a basis for his arrest.**

It is apparent that JR's statement alone was also not sufficient to establish probable cause, for, as the district court correctly found and I agree, it is well-settled that a claimant's allegation of criminal activity establishes probable cause to arrest _only_ when "_it seems reasonable to believe [that person] is telling the truth._" *Gramenos v. Jewel Co.,* 797 F.2d 432, 439 (7th Cir. 1986) (emphasis added). *AND*

*HERE, FOR THE REASONS SET FORTH IN DETAIL HEREIN, AND ESPECIALLY CONSIDERING THE FACT THAT THE INNER LIP CUTS WERE NOT CONSISTENT WITH ANY EVIDENCE OF AN OUTSIDE BLOW OR TRAUMA TO THE FACE FROM A 200-LB. ADULT MALE, GIVEN THAT THERE WAS NO BRUISE, ABRASION, LACERATION MUCH LESS ANY OTHER SIGN OF TRAUMA TO THE OUTER SKIN OF HIS FACE OR NOSE, AND CONSIDERING THAT JR WAS FULLY CAPABLE AND HAD THE OPPORTUNITY, INTENTION, AND MOTIVE TO HARM HIMSELF AND OTHERS (ANDERER AND COOK) AS DIAGNOSED AND RECORDED BY THE CHILD PSYCHIATRIST DR. O'GRADY*, it was *entirely unreasonable* for the police officers to arrest Anderer on the assumption that JR was truthful in launching the malicious and fictitious abuse allegation—at least without performing a proper investigation into the matter (which the police utterly failed to do).

Viewing all of these factors together as part of the total picture, as well as the law applicable thereto at this particular stage of the proceedings, it was indeed *unreasonable* that the police proceeded to arrest Anderer without conducting an adequate investigation (no physical or medical examination of JR) and without interviewing the relevant police and lay witnesses (and not just a select few) such as the citizen witness Mitchell and the officers who were witnesses at the alleged crime scene, *whom investigators well knew were available and able to give testimony exculpating Anderer*. As I have noted, Officers Centeno, Bohlen and Cook, as well as Mitchell, would have exonerated Anderer—but *not one of these witnesses were interviewed* prior to Anderer's arrest. We must ask ourselves: Why was not even one of the four exculpatory police witnesses or Mitchell timely interviewed?

But possibly, given the tenacity and haste with which Chief Jones repeatedly pursued both criminal and internal

charges against Anderer, in the face of the overwhelming amount of exculpatory evidence, it very well may be that the investigating officers were prodded by their Chief and/or other command officers into conducting an 'express track' investigation of officer (Anderer). Chief Jones's subsequent (post-arrest) treatment of Anderer's case, despite the mountain of evidence exonerating Anderer available to him in the decision making process, certainly reflected a most unusual and dogged determination to have Anderer prosecuted and discharged from the force, given that:

> (1) After the Deputy District Attorney Jon Reddin determined Anderer's charge would be "no processed," because it utterly "lacked prosecutable merit," ***Jones refused to accept that judgment and proceeded to reopen the criminal investigation into JR's accusations***—allegedly to ensure "the investigating officers had not missed any facts." Jones Aff. ¶ 10. In addition, although mentioned by Reddin in his no prosecute letter, any reference to alleged prior disciplinary actions taken against Anderer could and should not be considered under these circumstances;(2) although this re-investigation turned up "[n]o information . . . to further [a] criminal prosecution," Hoerig Aff., Ex. 1001 at 3, Chief Jones nonetheless had the temerity to ***request, after another fruitless investigation by Lt. Hoerig, that District Attorney E. Michael McCann re-evaluate Jon Reddin's prior decision not to press charges***;

> (3) McCann reaffirmed the prior decision not to prosecute, again concluding the criminal charge lacked prosecutable merit; in supporting his decision not to prosecute Anderer, McCann cited Reddin's original no-prosecute memo where Reddin stated: "I cannot say with any assurance what happened . . . . It is entirely conceivable . . . given [JR's] agitation, mental

problems and stated intentions to get money out of this incident, that he inflicted the injuries to himself." Arthur Jones Aff., Exh. 1002.

(4) then, just after Anderer filed the instant lawsuit on July 2, 2001, Chief Jones's IAD Commander, Steven Settingsgaard decided forthwith—without any new or additional evidence of Anderer's guilt—on July 6, 2001, ***to press internal charges (levied just 96 hours after Anderer filed suit against Jones and the case had laid dormant for a month) against Anderer for mistreatment of a prisoner, resulting in an order by Chief Jones to terminate Anderer***.

Viewed in light of Jones's own *unremitting determination* to prosecute and discharge Anderer for "abuse," the failure of investigators to conduct an adequate investigation prior to arresting Anderer (all at Jones's request), though no less unreasonable, is at the very least less surprising. Indeed, we must wonder if this type of unreasonable, careless and improper investigation (unfortunately) may have happened before at the MPD during the past few years. *See, e.g., Driebel,* 298 F.3d at 622.[30] This begs the following question: How

---

[30] The investigation techniques employed by the IAD investigators in this case may, at best, be described as shocking. Many of the potential witnesses in this case were subjected to intimidation and threats by IAD officers seeking to somehow gather evidence that would suggest Anderer had committed a crime. On the night of the alleged incident, Officers Cook and Logan were both asked to give a statement dealing with the criminal investigation of JR's allegations against Anderer. Both officers refused to make a statement until they were provided with a representative, as guaranteed them under the MPD rules and regulations. Neither were provided with representatives, but were threatened with a PI-21 (which would compel them to give a statement notwithstanding the denial of representation). Later that same night,

(continued...)

---

[30] (...continued)
Cook was threatened with immediate suspension if he did not give a statement, and he relented. The first question asked of him was whether "Officer Shoman was involved with Officer Anderer." Cook Aff. ¶ 46. Cook told the investigators that he "did not know, nor was it germane to the subject." *Id.* Cook then asked that the investigators note that every answer he was giving was "under duress," which investigators failed to note on any of the documents included in the record. *Id.* at 49. Also, the next day, on April 18, 2001, Officer Logan requested that he have a representative present before answering any questions and was told that if he did not give a statement he would be "suspended until further notice." Logan Aff. ¶ 38. Logan then answered the IAD investigators' questions.

During Lt. Hoerig's second investigation into JR's allegations the same type of coercive and intimidating tactics were employed. Officers Shoman, Cook, Logan, and Anderer were all subjected to threats and coercion throughout the investigation. On June 12, 2001, Officer Shoman (invoking her contractual rights) also refused to make a statement without representation. Hoerig responded by bringing two sergeants in to compel Shoman to make statement. Shoman continued to refuse to make a statement without a representative and was threatened with suspension. Detective Harrison told her: "It's not worth your job." Shoman Aff. ¶ 34. After sitting in silence for 15 minutes Shoman finally broke down and said that she would give a statement, but requested that it be noted in the reports that *she was speaking "under duress."* *Id.* at 35. *At the end of the interview Officer Shoman indicated her displeasure with the proceedings and voiced her opinion that the entire investigation was "personal" and "crooked."* *Id.* at 48.

Officers Cook and Logan had similar experiences with the IAD officers during the second round of investigation. Under threat of suspension each eventually agreed to answer questions (however, it took 20 minutes of discussion and Cook offering his firearm to investigators as well as threats and coercion by the IAD before the officers caved in and talked). Both officers voiced their displeasure with the investigatory process: Cook stating that he *believed IAD*

(continued...)

many other officers, if any, were subjected to the same type of hurried and prejudicial rush to judgment and arrested without probable cause?

Perhaps the majority's ill-advised and less than complimentary statement insisting that my detailed discussion of the facts exonerating Anderer, combined with the inadequacy of the MPD's investigation "might present a persuasive closing argument," Opinion at *11 n.9, merely reflects the depth of their frustration over the fact that they are unable to overcome the overwhelming evidence of Anderer's lack of culpability and the important Constitutional questions raised in my dissent. Anderer, like every other citizen of the United States, is entitled to have his freedom from search and seizure vigorously protected by the courts and to be presumed innocent until proven guilty by a jury of his peers in a court of law; thus, the fact that he is a police officer does not mean that he is "relegated to a watered-down version of constitutional rights." *Driebel*, 298 F.3d at 637. And in this case, after reviewing the record as a whole and the law applicable thereto, I am convinced that the conduct of the IAD during the investigation into JR's abuse charge constituted an unreasonable and careless inquiry and that it amounted to nothing but an utter sham, pursued without regard for the truth and, in fact, was in violation of Anderer's Fourth and Fifth Amendment, as well as his contractual, rights. When the record is viewed as a whole and the evidentiary record construed in his favor as is required at this stage in the proceedings, it is apparent that Anderer has presented more than enough evidence to survive summary judgment, for it is clear that a reasonable juror could (and would) find, based on the undisputed facts Anderer has

---

[30] (...continued)
*and MPD command officers were out to "get" Anderer; and Logan stating that he believed that Anderer's termination was an act of "retaliation."*

presented and the absence of evidentiary support to the contrary, that probable cause did not exist to arrest Anderer. *See Applebaum v. Milwaukee Metro. Sewerage Dist.*, 340 F.3d 573, 578-79 (7th Cir. 2003). Accordingly, I dissent from the majority's opinion and *URGE THAT THE DISTRICT COURT'S GRANT OF SUMMARY JUDGMENT FOR DEFENDANTS BE REVERSED AND THIS CASE BE REMANDED TO THE DISTRICT COURT FOR TRIAL IN ORDER THAT ANDERER MAY BE ALLOWED TO PRESENT HIS CASE, IN ITS ENTIRETY, BEFORE A JURY OF HIS PEERS.*[31]

A true Copy:

        Teste:

                        _____
                        *Clerk of the United States Court of
                        Appeals for the Seventh Circuit*

---

[31] While I am of the opinion that the district court's decision granting summary judgment in favor of Jones and denying Anderer a trial on the merits of his claim that his constitutional rights were violated when he was arrested without probable cause was in error, I concur with the majority's decision on Anderer's First Amendment claim and need not discuss the issue.